**Rosemarie RUFFEL**

v.

**Lance RUFFEL.**

**No. 2004–6–Appeal.**

Supreme Court of Rhode Island.

June 28, 2006.

---

Lauren E. Jones, Esq., Providence, for Plaintiff.

Robert S. Parker, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice SUTTELL, for the Court.

The plaintiff, Rosemarie Ruffel, appeals a December 29, 2003 Family Court order

resolving all financial aspects of her divorce with the defendant, Lance Ruffel. Rosemarie contests the Family Court's rulings concerning the equitable distribution of the marital estate, valuation of the marital assets, certain evidentiary issues, and the failure to award rehabilitative alimony and counsel fees. For the reasons set forth herein, we vacate the order and remand the case to the Family Court for further proceedings consistent with this opinion.

## I

### Facts and Procedural History

The parties were married on July 26, 1997. It was the second marriage for both, and there were no children born of the union. By all accounts, this marriage was troubled from its inception. As the Family Court general magistrate aptly noted, "[i]n hindsight this marriage was a disaster waiting to happen." Indeed, after only three years of marriage, Rosemarie filed for divorce, but dismissed the complaint after the parties reconciled. She filed a second complaint in October 2001.

The Family Court bifurcated the divorce proceedings, granting an absolute divorce on the ground of irreconcilable differences that had caused the irremediable breakdown of the marriage on May 9, 2002, and reserving all remaining issues, including equitable distribution and alimony, to be determined at a later date. A "final judgment" was entered on December 16, 2002. Thereafter, the financial aspects of the marital dissolution were tried before the general magistrate between May 21, 2003 and September 3, 2003. On November 26, 2003, the general magistrate rendered a bench decision, which was reflected in an "ORDER FROM DECISION OF NOVEMBER 26, 2003," entered on December 29, 2003.

Intense acrimony between the parties is evident from the record, and it appears that at no time was this marriage harmonious. The parties participated in counseling throughout the marriage, touching on such issues as Rosemarie's adult son living with the parties, Rosemarie's desire to work, whether a closet door should be open or closed while they slept, sex, jealousy, and Rosemarie's attention to her dying dog. Whether the parties would reside in Rhode Island or Oklahoma was another continuing matter of discord. Rosemarie testified that she and Lance had agreed to reside in Rhode Island and travel periodically to and from Oklahoma to attend to Lance's business interests there. Lance testified that his many attempts to get Rosemarie to spend more time with him in Oklahoma during the marriage were futile.

Before the marriage, Lance had acquired interests in Lance Ruffel Oil & Gas Corporation and Rolling Rock, LLC, both Oklahoma corporations. Also before the marriage, Lance purchased a home at 34 Sage Drive in Cranston, Rhode Island. The title was held in both Lance's name and Rosemarie's maiden name as joint tenants. The couple furnished the home together, and they added improvements to the property, including an additional garage and a sunroom, both before and during the marriage. Also, before the parties wed, Lance gave Rosemarie certain jewelry and an overriding royalty interest in an oil well known as Alliance.[1]

---

1. Overriding royalty interests "entitle their owner(s) to a share of the mineral production from a property or to a share of the proceeds thereupon. They do not contain the rights and obligations of operating the property and normally do not bear any of the costs of exploration, development and operation of the property."

During the marriage, the couple traveled extensively and lived a comfortable lifestyle. According to Rosemarie, although the couple dined out frequently, she regularly entertained Lance's friends and associates and assisted with his business interests, including decorating his office in Oklahoma. The primary source of income during the marriage was Lance's oil and gas holdings, with a much lesser amount being derived from Rosemarie's interest in the Alliance oil well. During most of the marriage, Rosemarie did not work outside the home, instead pursuing various educational and business endeavors mostly financed by Lance's income. Both parties presented evidence of bad conduct during the marriage, each party contentiously faulting the other for the marriage's dissolution.

In a bench decision on November 26, 2003, the general magistrate found that the marital estate subject to distribution consisted of the following: (1) the real estate at 34 Sage Drive, Cranston, Rhode Island; (2) a condominium in Oklahoma City, Oklahoma, that the parties purchased together during the marriage; (3) the appreciation in value of a condominium in Copper Mountain, Colorado, that Lance bought before the marriage; (4) the appreciation in value of defendant's premarital interest in Lance Ruffel Oil & Gas Corporation; (5) the appreciation in value of defendant's premarital interest in Rolling Rock, LLC; (6) defendant's working and overriding interests;[2] (7) plaintiff's overriding royalty interest in the Alliance oil well; (8) certain stock, retirement, bank, and IRA accounts; and (9) certain tangible assets, including an automobile, household furniture, art, jewelry, and furs.

In applying the factors enumerated in G.L.1956 § 15–5–16.1,[3] the statute that governs equitable distribution, the general

Energy Information Administration, http://www.eia.doe.gov/glossary/glossary_ r.htm (last visited June 8, 2006).

2. A working interest is
"[a]n interest in a mineral property that entitles the owner of that interest to all of [the] share of the mineral production from the property, usually subject to a royalty. A working interest permits the owner to explore, develop, and operate the property. The working-interest owner bears the costs of exploration, development, and operation of the property and, in return, is entitled to a share of the mineral production from the property or to a share of the proceeds therefrom. It may be assigned to another party in whole or in part, or it may be divided into other special property interests." Energy Information Administration, http://www.eia.doe.gov/glossary/glossary_w.htm(last visited June 8, 2006).

3. The assignment of property upon divorce is governed by the factors listed in G.L.1956 § 15–5–16.1(a):
"(1) The length of the marriage;
"(2) The conduct of the parties during the marriage;

"(3) The contribution of each of the parties during the marriage in the acquisition, preservation, or appreciation in value of their respective estates;
"(4) The contribution and services of either party as a homemaker;
"(5) The health and age of the parties;
"(6) The amount and sources of income of each of the parties;
"(7) The occupation and employability of each of the parties;
"(8) The opportunity of each party for future acquisition of capital assets and income;
"(9) The contribution by one party to the education, training, licensure, business, or increased earning power of the other;
"(10) The need of the custodial parent to occupy or own the marital residence and to use or own its household effects taking into account the best interests of the children of the marriage;
"(11) Either party's wasteful dissipation of assets or any transfer or encumbrance of assets made in contemplation of divorce without fair consideration; and
"(12) Any factor which the court shall expressly find to be just and proper."

magistrate made findings that: the marriage was relatively short, Rosemarie "made no contribution monetary or otherwise" to the marital estate, both parties were in good health and had the opportunity for future acquisition of capital assets and income, and Lance had contributed to increasing Rosemarie's earning power by paying for her schooling. The general magistrate also found that "[t]he major problems in the marriage were all of [p]laintiff's choosing," specifically her concerns about her dog dying, her refusal to have her adult son move out of the marital domicile, her refusal to leave Rhode Island, and her relationship with a third-party male over a long period.

The general magistrate calculated the value of the marital estate to be $1,220,310.07. Based on the evidence presented, he ordered a distribution entitling Rosemarie to 20 percent and Lance to 80 percent of the marital estate. As part of her share of the estate, the Family Court awarded plaintiff her interest in the Alliance oil well, jewelry, and fur coats. With these items and an advance that she previously received factored into her 20 percent share, the general magistrate determined that Rosemarie owed Lance $27,530 in cash after the distribution. He also denied plaintiff's requests for alimony and counsel fees. An order was entered on December 29, 2003, from which Rosemarie timely appealed.

## II

### Standard of Review

■ "This Court's 'review of a decision of a [F]amily [C]ourt justice is deferential. We do not disturb the trial justice's findings of fact unless it can be shown that he or she has overlooked or misconceived relevant and material evidence or was otherwise clearly wrong.'" *Brown v. Jordan,* 723 A.2d 799, 800 (R.I.

1998) (mem.) (quoting *Oduyingbo v. Oduyingbo,* 685 A.2d 280, 280 (R.I.1996) (mem.)). When parties contest the equitable distribution of marital assets, "this [C]ourt will not disturb the trial justice's findings where he or she has scrupulously considered all of the elements set forth in * * * § 15–5–16.1." *Tarro v. Tarro,* 485 A.2d 558, 560 (R.I.1984). "Conversely, an order of distribution of marital assets will be vacated and the case remanded for a rehearing where the trial justice overlooks salient uncontradicted evidence in determining the amount of assets to be distributed." *Stephenson v. Stephenson,* 811 A.2d 1138, 1142 (R.I.2002).

## III

### Discussion

### A. The Proper Date for Valuation of Assets

■ It is well established in Rhode Island that "[t]he equitable-distribution process requires three steps. First, the trial justice must determine which of the parties' assets are marital property and which are nonmarital property. Second, the trial justice must consider the factors enumerated in § 15–5–16.1. Third, he or she must distribute the marital property." *Vanni v. Vanni,* 535 A.2d 1268, 1270 (R.I. 1988). The threshold issue raised in the present appeal concerns the first step of this process. We must determine the proper "terminal date" of this marriage for the purpose of identifying which assets were eligible for equitable distribution. *See id.* Rosemarie contends that the Family Court erred by limiting evidence of the valuation of marital assets to December 31, 2001, based on an alleged agreement between the parties that plaintiff disputed ever occurred, rather than using the date that the final divorce decree was entered, December 16, 2002, as

the terminal date for equitable distribution.

 In this state, "parties to a divorce action remain as husband and wife until the entry of the final decree of divorce." *Vanni*, 535 A.2d at 1270. Accordingly, this Court repeatedly has reaffirmed that assets acquired at any time until the entry of a final divorce decree are marital property subject to equitable distribution. *See, e.g., Gervais v. Gervais*, 688 A.2d 1303, 1308 (R.I.1997); *Giha v. Giha*, 609 A.2d 945, 948–49 (R.I.1992); *Saback v. Saback*, 593 A.2d 459, 461 (R.I.1991); *Vanni*, 535 A.2d at 1270. The final decree date is the terminal date for equitable distribution "absent an express agreement to the contrary." *Janson v. Janson*, 773 A.2d 901, 904 (R.I.2001).

Parties may make an express agreement to change the terminal date for equitable distribution under Rule 1.4 of the Family Court Rules of Practice, which provides: "All agreements of parties or attorneys touching the business of the court *shall be in writing, unless orally made or assented to by them in the presence of the court* when disposing of such business, *or they will be considered of no validity.*" (Emphases added.) Although this Court has not had occasion to address this particular Family Court rule of practice, we have interpreted Rule 1.4 of the Superior Court Rules of Practice, which is identical in language to the Family Court rule. *See* Super.Ct.R.Prac. 1.4. In interpreting the Superior Court version of the rule, this Court has equated the language that oral agreements must be made "in the presence of the court" with a requirement that oral agreements must be made on the record to be valid. *See, e.g., E.W.H. &*

*Associates v. Swift*, 618 A.2d 1287, 1288–89 (R.I.1993).[4]

For example, in *Swift*, one party attempted to enforce an oral settlement agreement allegedly made during out-of-court negotiations, which included terms that the other party disputed on appeal. *Swift*, 618 A.2d at 1288. We held that unless an alleged agreement is in writing or on the record, a court may not compel parties to abide with it when the parties do not agree about its terms. *Id.* at 1289. We said that there are two ways for parties to preserve their agreements in accordance with the rules of practice: (1) by placing them on the record; or (2) by reducing them to agreed-upon writings. *Swift*, 618 A.2d at 1289; *see also DiLuglio v. Providence Auto Body, Inc.*, 755 A.2d 757, 776–77 (R.I.2000) (declining to uphold an alleged agreement to bifurcate that was not in writing or on the record); *Melucci v. Berthod*, 687 A.2d 878, 879 (R.I.1997) (holding unenforceable a purported settlement agreement because it was never placed on the record or reduced to an agreed-upon writing). This Court's reasoning was that "[r]equiring stipulated agreements either to be placed on the record or to be reduced to an agreed-upon writing ensures that the agreement itself does not become a source of further controversy and litigation." *Swift*, 618 A.2d at 1288–89.

In this bifurcated proceeding, a decree dissolving the parties' marriage was entered on December 16, 2002, and the financial aspects of the divorce were resolved by an order entered on December 29, 2003. The Family Court, however, applied December 31, 2001 as the date to classify and value the parties' marital and nonmarital assets. The general magistrate based his

4. Although we interpreted Rule 1.5 of the Superior Court Rules of Practice in *E.W.H. & Associates v. Swift*, 618 A.2d 1287, 1288 (R.I. 1993), the same language interpreted appears today in Rule 1.4 of the Superior Court Rules of Practice.

ruling on a representation made to him by defendant's attorney that the parties had agreed that December 31, 2001 would be the date of valuation for purposes of equitable distribution.[5] Because the record is devoid of any written stipulation[6] or agreement, however, any such agreement was of no validity. The Family Court, therefore, improperly restricted evidence concerning the valuation of assets to December 31, 2001.

■ This conclusion necessitates a remand for a revaluation of the marital assets. Accordingly, we discuss briefly the impact on such proceedings of the recently decided case of *Cardinale v. Cardinale*, 889 A.2d 210 (R.I.2006). In *Cardinale*, the parties and trial justice agreed to a bifurcated divorce. *Id.* at 214. After a lengthy and rather convoluted procedural history, the Family Court justice made an equitable distribution in *Cardinale*, purportedly based upon the date of the parties' final decree of divorce. *Id.* at 217. The financial portion of the bifurcated proceeding, however, was not resolved until more than a year after the final decree was entered, allowing the husband "to stonewall the discovery process and ultimately frustrate the timely equitable distribution of the marital estate" by accumulating and dissipating

substantial marital assets in the interim. *Id.* at 218, 220.

To ensure that divorce litigants would not be able to continue this practice in the future, this Court held that a bifurcated procedure was inappropriate in divorce cases. *Cardinale*, 889 A.2d at 228. We declared "unequivocally" that, except in extraordinary cases and then only with respect to issues involving children, "all the issues between the parties shall be adjudicated in a single proceeding." *Id.*

In addition, this Court held that the date of the final divorce decree was not the proper valuation date in *Cardinale*. We said that the parties' interests "should not arbitrarily be limited to the date of the 'final decree' of divorce when issues concerning equitable distribution were not resolved until more than a year later." *Cardinale*, 889 A.2d at 220. Our rationale was that the first portion of a so-called bifurcated divorce proceeding does not result in a "final" decree of divorce, because the case remains pending in the Family Court until all issues have been decided. *Id.* at 227.[7] Accordingly, in *Cardinale*, this Court used the date of the final judgment, when all the equitable issues were purport-

---

5. Although the record does not suggest that either party was attempting to mislead the court, this case amply demonstrates the wisdom of the rationale articulated in *Swift*, 618 A.2d at 1288–89. The general magistrate said that he believed such an agreement had been made between defendant's counsel and plaintiff's former counsel. However, defendant's counsel said that he had agreed with plaintiff's current counsel that events occurring after December 31, 2001 would not be considered with respect to issues of both conduct and valuation of assets. The plaintiff's current counsel denied making such an agreement, but added "we talked about conduct through the date of the actual hearing on the merits of the divorce."

6. The defendant's attorney said, "I know for a fact when this case was heard on its merits there was a stipulation that the valuation of this marital estate would be as of December 31, 2001." A review of the transcript of May 9, 2002, when the Family Court heard the case on the merits, however, reveals no such stipulation.

7. This Court noted that the only way a proceeding that does not dispose of all issues of a divorce results in a "final" decree is if the trial court determines under Rule 54(b) of the Family Court Rules of Procedure that there is "no just reason for delay" and gives "an express direction for the entry of judgment." *Cardinale v. Cardinale*, 889 A.2d 210, 227 (R.I.2006) (quoting Fam.Ct.R.P. 54(b)).

ed to be resolved, as the terminal date for equitable distribution. *Id.* at 228.

We believe that a similar disposition is warranted in the present case, in which the appropriate valuation date is one of the very issues on appeal.[8] Here, a "final decree of divorce" was entered on December 16, 2002, without resolution of the financial aspects of the divorce. According to the *Cardinale* rationale, therefore, the Ruffels' divorce was not "final" on December 16, 2002, but rather still was pending in the Family Court until all aspects of the divorce were resolved. *See Cardinale,* 889 A.2d at 227. We hold, therefore, that December 29, 2003, when the final order resolving the Ruffels' equitable-distribution issues was entered, is the proper terminal date in this case.

### B. Classification of Property as Marital or Nonmarital

Rosemarie also contends that the Family Court erroneously included in the marital estate certain premarital property: a Cranston home at 34 Sage Drive and its furnishings, certain jewelry that Lance gave to Rosemarie before the marriage, and Rosemarie's interest in the Alliance oil well, which Lance also gave to her before the marriage. The plaintiff further argues that the Family Court erroneously failed to include in the marital estate the appreciation in value of defendant's separate oil and gas holdings during the marriage.

■ Identifying which assets are included in the overall marital pot is a crucial first step in the distribution process. *See Vanni,* 535 A.2d at 1270. "We have previously stated that a trial justice in undertaking to distribute marital assets must initially separate nonmarital assets from the marital assets in accordance with

§ 15–5–16.1." *DiOrio v. DiOrio,* 751 A.2d 747, 751 (R.I.2000) (quoting *Gervais,* 688 A.2d at 1305). Under § 15–5–16.1(a), the Family Court is granted broad discretionary authority to "assign to either the husband or wife a portion of the estate of the other." The Family Court is prohibited by statute from assigning three categories of property: (1) "property or an interest in property held in the name of one of the parties if the property was held by the party prior to the marriage" (although any income or appreciation in value of that property attributable to the efforts of either spouse during the marriage is included); (2) "property or an interest in property which has been transferred to one of the parties by inheritance before, during, or after the term of the marriage;" and (3) "property or an interest in property which has been transferred to one of the parties by gift from a third party before, during, or after the term of the marriage." Section 15–5–16.1(b).

### 1. 34 Sage Drive

■ Approximately eight and a half months before the marriage, Lance purchased real estate at 34 Sage Drive in Cranston. The deed conveyed the property to both parties as joint tenants. Rosemarie argues that because she and Lance owned 34 Sage Drive as joint tenants before their marriage, her interest in it was a premarital gift from Lance and not part of the marital estate. Although Lance acknowledges that he purchased the property in both names as joint tenants, he contends that the property is a "joint marital asset subject to equitable distribution," or, alternatively, that its character changed into a marital asset by virtue of home

---

8. We note that the general magistrate in the present case was without the benefit of this Court's holding in *Cardinale* when he decided to bifurcate the Ruffels' divorce proceeding on May 9, 2002.

improvements undertaken during the marriage.

 Although we have not had occasion to address the precise question presented here, *viz.*, whether the undivided one-half interest of each joint tenant created before the marriage of such joint tenants should be excluded from the marital estate, this Court has addressed the property interest of joint tenancy more generally. The Rhode Island General Assembly has not defined a joint tenancy in real property statutorily; the property interest exists, instead, under common law. A joint tenant of real property holds an "undivided one-half interest" in the property. *See Lucchetti v. Lucchetti,* 85 R.I. 105, 111, 127 A.2d 244, 248 (1956). To create an estate in joint tenancy, the four unities of interest, title, time, and possession are essential, which means that, "joint tenants are required to have equal interests, acquired by the same conveyance, commenced at the same time and held by the same undivided possession." *Knibb v. Security Insurance Company of New Haven,* 121 R.I. 406, 410, 399 A.2d 1214, 1216 (1979). "[E]ach tenant stands in exactly the same position as all the others." *Id.* at 410n.3, 399 A.2d at 1216n.3.

We are satisfied that a premarital joint tenancy in real estate, particularly when, as here, the property was purchased shortly before the marriage, is not encompassed within the statutory exception of "an interest in property held in the name of one of the parties * * * prior to the marriage." Section 15–5–16.1(b). Rather, we conclude that the general magistrate's inclusion of 34 Sage Drive as part of the marital estate was a sustainable exercise of his discretion to classify and assign marital assets. The record contains sufficient evidence to support his finding. Both parties made improvements to the real estate during the marriage, and it served as their marital home in Rhode Island. Although we affirm the general magistrate's finding that 34 Sage Drive was a marital asset, we recognize that he is not constrained from ordering a different assignment on remand after the revaluation of assets.

## 2. Jewelry

 Rosemarie also challenges the Family Court's inclusion in the marital estate of jewelry Lance gave to her before the marriage. Specifically, she alleges that Lance gave her premarital gifts of jewelry worth $57,000, including gold and diamond earrings valued at $6,000, an engagement ring valued at $38,000, a tanzanite and tourmaline enhancer valued at $3,400, a gold necklace designed to hold the enhancer, valued at $2,600, a gold bracelet valued at $1,800, and a ladies' platinum wedding ring valued at $5,200. The engagement and wedding rings were lost during the marriage and, according to Lance, were replaced using insurance proceeds as well as additional marital funds. The Family Court included jewelry worth $119,565 in the marital estate subject to distribution, and assigned those items of jewelry to Rosemarie as a portion of her 20 percent share of the estate. The general magistrate did not delineate exactly which pieces of Rosemarie's jewelry collection he included as part of the marital estate. It is clear, however, that the figure of $119,565 encompassed at least some of the premarital gifts of jewelry to Rosemarie.

Section 15–5–16.1(b) makes clear that property held in the name of one of the parties before marriage is excluded from the marital estate. Rosemarie argues that her jewelry falls within this definition of nonmarital property because Lance gave it to her as a premarital gift. We agree.

 The result of a valid gift of property is that title to that property is

transferred from the donor to the donee. The elements of a valid gift are a "present true donative intent on the part of the donor," and "some manifestation such as an actual or symbolic delivery of the subject of the gift so as to completely divest the donor of dominion and control of it." *Black v. Wiesner,* 112 R.I. 261, 267, 308 A.2d 511, 515 (1973).

In the present case, Lance does not dispute that at least some of the jewelry were premarital gifts to Rosemarie, or that Rosemarie kept possession of the items of jewelry throughout the course of the marriage. *See Quinn v. Quinn,* 512 A.2d 848, 854 (R.I.1986) (upholding a trial justice's finding that a husband had made a valid gift of inherited jewelry to his wife because her possession of the jewelry throughout the course of the marriage with his full knowledge and consent showed his donative intent to give her the jewelry). We therefore hold that the Family Court misconceived or overlooked evidence when it included all Rosemarie's jewelry as a portion of her 20 percent share of the marital estate. Upon remand, those items Rosemarie acquired before the marriage must be excluded from the marital estate as Rosemarie's nonmarital assets.

■ We further note, however, that those items that were lost during the marriage and replaced with insurance proceeds no longer are Rosemarie's separate nonmarital property. Additional amounts used to replace the lost premarital gifts were marital funds. The commingling of the insurance proceeds with the separate additional amounts, which were marital in nature because they were expended during the marriage, caused the newly acquired, more expensive, jewelry replacements to become part of the marital estate. *See Quinn,* 512 A.2d at 853 ("When marital and nonmarital assets are commingled and then exchanged for other property, the newly acquired asset is marital property.").

### 3. Alliance Oil Well

■ Rosemarie also contends that her interest in the Alliance oil well was a premarital gift not subject to distribution. As he did with the jewelry, the general magistrate included Rosemarie's interest in the Alliance oil well in the marital estate and distributed its value as part of her 20 percent share. As noted previously, if a valid gift was made to Rosemarie before the parties married, that gift should not have been included as part of the estate subject to distribution. Under § 15–5–16.1(b), that gift would be property held in the name of one of the parties before the marriage, which is excluded from distribution.

Lance does not dispute that he gave Rosemarie her interest in the Alliance oil well before the marriage; nor does the record provide any indication that she was given less than full control over this overriding royalty interest. That property, therefore, was a valid premarital gift and should not have been included in the overall valuation of the marital estate.

### 4. Appreciation of Defendant's Separate Oil and Gas Holdings

Rosemarie's final alleged error concerning which property was included in the marital estate involves Lance's separate oil and gas holdings. She argues that her expert witness testified that these interests had appreciated by $303,400 over the course of the marriage, whereas defendant's expert failed to appraise the increase in their worth. Thus, she contends, the general magistrate overlooked the uncontroverted evidence when he failed to include any appreciation of these assets in the marital estate. Although we are satis-

fied that the general magistrate was acting well within his discretionary authority to credit the testimony of one expert over that of another, *see Harvard Pilgrim Health Care of New England, Inc. v. Gelati,* 865 A.2d 1028, 1035 (R.I.2004), we need not address the issue at this time. The parties will be required to submit evidence on remand concerning the value of all marital assets as of December 29, 2003, and the Family Court necessarily will make credibility determinations and weigh the evidence anew.

## C. Evidentiary Rulings

Rosemarie also challenges some of the Family Court's evidentiary rulings. "It is well established that 'the admissibility of evidence is within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of that discretion is apparent.'" *DiPetrillo v. Dow Chemical Co.,* 729 A.2d 677, 690 (R.I.1999) (quoting *Soares v. Nationwide Mutual Fire Insurance Co.,* 692 A.2d 701, 701–02 (R.I.1997) (mem.)). Rosemarie asserts that the Family Court magistrate erroneously excluded three proffers of evidence during the equitable distribution portion of the Ruffels' divorce proceedings.

### 1. Rebuttal Testimony

 During the trial, in the midst of reciting a litany of alleged incidents of physical and emotional abuse committed by plaintiff, Lance testified that in early January 2000, Rosemarie was lying in bed with him "and she leaned over and said 'How does it feel to be laying [*sic*] next to someone who hates you?'" Later in the proceedings, in rebuttal, Rosemarie attempted to explain the context in which she made this statement, but the general magistrate sustained defendant's objection to her testimony.

Consequently, Rosemarie's counsel made an offer of proof indicating that Rosemarie would testify about a costume party that she and Lance had attended earlier that evening at which Lance was dressed in a skirt. During the course of the party, Rosemarie observed another man remove defendant's underwear and fondle his genitals. The incident resulted in an argument during which Rosemarie asked Lance to leave the marital bed. The comment at issue, counsel continued, was Rosemarie's retort to his refusal to leave the bed. On appeal, Rosemarie argues that this testimony was "highly relevant" because it would have given context to her statement, which she uttered in anger. Rosemarie also contends that the general magistrate abused his discretion in excluding this rebuttal testimony because it was relevant concerning the conduct of the parties during the marriage—a factor that must be taken into account in equitable distribution under § 15–5–16.1(a)(2).

 This Court has stated that "'the proper function and purpose of rebuttal testimony is to explain' or to discredit the evidence of an adverse party." *State v. Kholi,* 672 A.2d 429, 433 (R.I.1996) (quoting *State v. Stewart,* 663 A.2d 912, 927 (R.I.1995)). "The admission of competent rebuttal evidence lies within the discretion of the trial justice." *Labree v. Major,* 111 R.I. 657, 675, 306 A.2d 808, 819 (1973). We have also held that a plaintiff must not hold back affirmative evidence during his or her case-in-chief. *Id.* "However, a plaintiff is not bound to anticipate a defense. Thus, in rebuttal he [or she] is entitled to answer new matter introduced by the defendant." *Id.* "[W]hen a defendant introduces evidence of a new and relevant part of his defense, the plaintiff is entitled to meet and discredit such evidence in rebuttal and the denial of this right to do so [is] error." *McGonagle v. Souliere,* 113 R.I. 683, 689, 324 A.2d 667,

670 (1974). We also have said, however, that a plaintiff "is strictly entitled to give *only* such evidence as tends to answer *new matter* introduced by [a] defendant." *Souza v. United Electric Railways Co.*, 49 R.I. 430, 432–33, 143 A. 780, 782 (1928). (Emphases added.)

The record reveals that Rosemarie had attempted to proffer evidence of the costume party incident earlier in the proceedings during her direct examination as an example of defendant's emotional abuse. Lance objected, arguing that plaintiff had failed to mention the specific incident in her answers to interrogatories. The general magistrate, however, initially overruled the objection and allowed Rosemarie to continue. She then testified, "I observed another man taking off my husband's underwear and fondling his testicles and penis." Lance renewed his objection, asserting that "such a despicable act" should have been divulged in plaintiff's answers to interrogatories, and that it was intended "to inflame this issue and inflame the Court." In then sustaining the objection, the general magistrate said:

> "THE COURT: I will sustain the objection. I agree [with defense counsel] that that type conduct or that type situation being described by [plaintiff] is certainly something that should have been contained within the discovery process. I allowed the response because I thought it would be, let me say something more normal and I have no problem describing a particular incident but that which she describes is beyond the normal in my opinion.
> " * * *
> "THE COURT: * * * You've got a discovery process that's in place to lessen the issues that have to be tried and to afford to both sides opportunities for more responsive answers * * * but the response is such that there is no way that something would not have been in-

cluded in my humble opinion within discovery."

On appeal, plaintiff does not challenge the preclusion of such testimony during her direct examination, contending rather that the general magistrate abused his discretion by excluding the evidence in rebuttal. We are satisfied, however, that the general magistrate was well within his discretionary authority to prevent plaintiff from recounting the same incident as rebuttal testimony that she had not been allowed to introduce in her case-in-chief. The general magistrate understandably was wary about allowing testimony pertaining to such prejudicial facts when those facts were of the type that normally would be revealed during discovery. Indeed, plaintiff was specifically asked in an interrogatory to "state with particularity all of the facts which show alleged fault or misconduct," but failed to recite the costume party incident. Although our rules do not bar a party from introducing evidence contrary to, or omitted from, his or her answers to interrogatories, we have recognized that "the court does have discretion to limit proof in light of answers to interrogatories." *Young v. Coca–Cola Bottling Co.*, 109 R.I. 458, 471, 287 A.2d 345, 352 (1972); *see also Padula v. Machado*, 416 A.2d 1184, 1187 (R.I.1980).

That the second attempt to offer this evidence was done in rebuttal does not avail Rosemarie. The statement Lance recounted during his testimony that Rosemarie wished to rebut was not new matter that came as a surprise to her during defendant's testimony, but rather was included in defendant's own answers to interrogatories. Therefore, the general magistrate's ruling to limit Rosemarie's testimony was a sustainable exercise of his abundant discretion in evidentiary matters.

### 2. Premarital Conduct

Next, Rosemarie argues that the general magistrate erred in refusing to

consider evidence of the parties' relationship and agreements before the marriage. During the equitable distribution hearings, Rosemarie sought to introduce evidence of problems that existed before the marriage and for which the couple sought counseling. The general magistrate ruled that he would consider only evidence of fault or bad conduct of the parties during the marriage, not before. He based his ruling on § 15–5–16.1(a)(2), which allows the "conduct of the parties *during the marriage*" to be considered in assigning property upon divorce. (Emphasis added.)

 We agree with the general magistrate that the clear language of this statute makes conduct of the parties before the marriage irrelevant for the purpose of equitable distribution. When its language is clear and unambiguous, this Court must interpret a statute literally. *Accent Store Design, Inc. v. Marathon House, Inc.*, 674 A.2d 1223, 1226 (R.I. 1996). "[T]here is no room for statutory construction and we must apply the statute as written." *State v. DiCicco*, 707 A.2d 251, 253 (R.I.1998) (quoting *In re Denisewich*, 643 A.2d 1194, 1197 (R.I.1994)). We hold, therefore, that the general magistrate did not abuse his discretion when he excluded evidence of each party's conduct before the marriage.

### 3. Defendant's Property Settlement Agreement From a Previous Marriage

 Rosemarie's final contention concerning the general magistrate's evidentiary rulings is that he erred in excluding evidence of Lance's divorce-settlement agreement relative to a previous marriage, offered to show Lance's perceived value of his separate oil and gas holdings before he married Rosemarie. It is clear from the record that the general magistrate excluded this evidence because he found it to be irrelevant. In making his decision to exclude evidence of the property settlement with Lance's first wife, the general magistrate distinguished *Zaino v. Zaino*, 818 A.2d 630 (R.I.2003). In *Zaino*, this Court affirmed a decision of the Family Court to reopen a fully executed divorce-settlement agreement and judgment. *Id.* at 635–36. We held that evidence of the agreement properly was before the Family Court because it was offered to prove that an ex-husband fraudulently had induced his ex-wife to enter into the agreement when it was created. *Id.* at 636. In the present case, as the general magistrate pointed out, neither party alleged that he or she was defrauded with respect to how much the other party was worth. The holding of *Zaino* that a prior divorce settlement was admissible in court, therefore, does not apply to the present facts.

 Furthermore, the exclusion of evidence on grounds of relevancy is soundly within the trial justice's discretionary powers, and we will not reverse that decision absent an abuse of discretion. *State v. Marini*, 638 A.2d 507, 516 (R.I.1994). In this case, Rosemarie proffered the evidence of Lance's past divorce settlement to show values of interests he owned at the time of Lance's and Rosemarie's marriage in 1997. Because the settlement agreement occurred nineteen months before Lance's and Rosemarie's marriage, we perceive no abuse of discretion in the general magistrate's decision that the evidence was irrelevant to the issue of how much Lance's interests were worth at the inception of the Ruffels' marriage. The evidence, therefore, properly was excluded.

### D. Equitable Distribution, Rehabilitative Alimony, and Counsel Fees

 Rosemarie alleges other errors in her appeal to this Court. She contends

that the general magistrate overlooked and misconceived material evidence and abused his discretion in determining that an 80/20 split of the marital estate was equitable. Because we already have determined that the Family Court used an improper valuation date to identify the parties' assets and distribute the marital estate, and consequently, a revaluation and new equitable distribution is imminent in this case, we need not address this assertion. We observe, however, that no abuse of discretion occurs when the trial justice "has scrupulously considered all of the elements set forth in * * * § 15–5–16.1." *Tarro*, 485 A.2d at 560. We further note that, predicated upon the theory of marriage as a partnership and the factors enumerated in § 15–5–16.1, marital "[a]ssets are to be divided equitably, though not necessarily equally." *Perreault v. Perreault*, 540 A.2d 27, 30 (R.I.1988). Ultimately, "the intent of property division is to provide a fair and just assignment of the marital assets * * * on the basis of the joint contribution of the spouses to the marital enterprise." *Stanzler v. Stanzler*, 560 A.2d 342, 345 (R.I.1989).

Although we are satisfied that the general magistrate did consider all the relevant factors and properly exercised his discretion in apportioning the marital estate, we recognize that a revaluation of marital assets may necessitate a different outcome. We therefore direct the Family Court, on remand, to once again scrupulously consider the above-referenced principles in light of our holdings today to make a fair and just distribution of the Ruffels' marital estate.

██ In addition, we are not able to reach a conclusion at this time with respect to Rosemarie's argument that the general magistrate abused his discretion in failing to award her rehabilitative alimony and counsel fees. Section 15–5–16 allows the Family Court to fix the amount of alimony and attorney's fees, which this Court reviews under an abuse-of-discretion standard. *Becker v. Perkins–Becker*, 669 A.2d 524, 529 (R.I.1996). Here, however, the proper amount to award for alimony, if any, will depend on the ultimate distribution of the marital estate by the Family Court on remand, after which it will be in a position to determine the parties' relative needs. *See, e.g., Berard v. Berard*, 749 A.2d 577, 581 (R.I.2000); *Fisk v. Fisk*, 477 A.2d 956, 958 (R.I.1984). Furthermore, § 15–5–16.1(c) specifically states that "[t]he assignment of property * * * shall precede the award of alimony." We therefore need not review the denial of alimony at this time.

██ Similarly, the decision of whether to award counsel fees will depend on what portion of the marital estate each party is assigned on remand. "Prior to awarding counsel fees the trial court must find that the party seeking counsel fees is unable to pay them." *Alves v. Alves*, 644 A.2d 1291, 1292 (R.I.1994). Also, in determining an award of alimony or counsel fees, § 15–5–16(b)(1)(iv) directs the Family Court to consider, among other factors, "[t]he state and the liabilities and needs of each of the parties," considerations that cannot fairly be made until the entire marital estate is correctly valued and equitably distributed.

## IV

### Conclusion

For the reasons set forth herein, we vacate the order of the Family Court, to which court the record shall be remanded for further proceedings in accordance with this decision. Upon remand, the Family Court shall revalue the marital estate as of December 29, 2003, and make an equitable distribution in accordance with § 15–5–16.1, taking all relevant factors and our

holding today into account. The Family Court then shall determine what amounts, if any, are proper for alimony and counsel fees and enter a new judgment.