Joseph P. ESPOSITO

v.

Sharon ESPOSITO.

No. 2010–328–Appeal.

Supreme Court of Rhode Island.

Jan. 30, 2012.

Christopher E. Friel, Esq., Warwick, for State.

Robert M. Duffy, Esq., Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice FLAHERTY, for the Court.

The parties to this appeal are former spouses, and the issue before us involves the property settlement agreement (the Agreement) that was entered into in connection with their divorce. This dispute centers around a single asset; a minority interest in Prime Time Manufacturing, Inc. The Agreement specified that the

plaintiff, Joseph P. Esposito,[1] would retain his 25 percent ownership interest in Prime Time. After the Agreement was approved by the Court, but before final judgment was entered, Joseph learned that his ownership interest in Prime Time was worth significantly more than the value upon which the parties had agreed. The defendant, Sharon Esposito, moved in the Family Court to reform the Agreement or to vacate the judgment, which motion was denied. Sharon has timely appealed to this Court. For the reasons set forth in this opinion, we affirm the order of the Family Court.

## I

### Facts and Travel

Sharon Esposito and Joseph Esposito were married on July 8, 1987. One child was born of the marriage. On February 21, 2005, Joseph initiated a divorce action against Sharon, declaring that irreconcilable differences between the parties had led to the irremediable breakdown of the marriage.[2] During the discovery phase of the litigation, and at the request of both parties, the court appointed the firm Piccerelli, Gilstein and Company, LLP, to appraise the value of Joseph's 25 percent ownership interest in the enterprise known as Prime Time. The Piccerelli appraisal was completed and submitted to the litigants on February 2, 2006. A subsequent, updated appraisal was provided to the parties on June 23, 2006. Each party was

provided the opportunity to obtain an independent appraisal of the business. In January 2007, Sharon indicated that she wished to do just that, and the court ordered the Piccerelli firm to provide Sharon's counsel with all the documents and records that it had relied on in the appraisal of Prime Time. Sharon's own accountants conducted an appraisal of the business, but their appraisal was lower than that of the Piccerelli firm. The parties then agreed to use the Piccerelli evaluation; they concurred that Joseph's share in Prime Time was worth $2.9 million.

On March 22, 2007, their negotiations completed, Joseph and Sharon entered into the Agreement for the purpose of equitably dividing their marital estate. The Agreement provided for the division of the marital assets, with 55 percent assigned to Sharon and 45 percent to Joseph. As part of Joseph's 45 percent share, he was assigned all his stock in Prime Time.[3] That very day, after it heard the divorce case on its merits, the Family Court approved the written Agreement that the parties had entered into. The court found that the Agreement equitably settled all the financial issues between the parties, and it ordered that the Agreement be incorporated, but not merged, into the judgment. Each party was granted an absolute divorce on the grounds of irreconcilable differences. A decision pending entry of final judgment was entered on March 22, 2007.

---

1. In this opinion, we refer to the parties as Joseph and Sharon. This is for the purpose of clarity only, and we intend no disrespect by using their first names.

2. This initial divorce proceeding was dismissed and later refiled by Joseph on March 31, 2006.

3. Paragraph 13 of the Agreement, entitled "Prime Time Manufacturing," specified:

"[Joseph] has an ownership interest in a business known as Prime Time Manufacturing, along with certain other minor related business entities. His ownership interest has an agreed-upon value of approximately $2,900,000.00. [Joseph] is awarded all right, title and interest in and to these businesses, free and clear of any claim by [Sharon]."

In August 2007, before final judgment was entered in the divorce, Joseph learned that the value of his share of Prime Time exceeded the $2.9 million figure that had been estimated by the Piccerelli evaluation. At that time, negotiations to sell Prime Time to Richline Group, Inc., a subsidiary of Berkshire Hathaway, Inc. were under way. Those negotiations were handled primarily by the majority stockholder of the company. On October 31, 2007, final judgment of divorce was entered between the parties. On November 13, 2007, Prime Time was sold to Richline, resulting in Joseph's realizing approximately $2.5 million more than what his share had been valued at in the Agreement.

On June 4, 2008, after learning about the increase in Joseph's interest in the company,[4] Sharon filed a motion under Rule 60(b)(1)(2)(3) and (6) of the Family Court Rules of Procedure for Domestic Relations.[5] The trial justice heard evidence on the motion and found that no concrete evidence had been brought forth that would demonstrate that at the time the divorce was granted and the Agreement was approved, the value of Prime Time was more than what had been provided for in the Piccerelli appraisal. He also found that no evidence was produced by Sharon to indicate that Joseph was privy to any negotiations or overture for the transfer or sale of the company at or before the time of the execution of the Agreement. On May 26, 2010, the Family Court justice denied Sharon's Rule 60(b) motion to amend or reform the Agreement. Sharon timely appealed to this Court.

## II

### Standard of Review

■■ This Court reviews a trial justice's decision in a divorce proceeding with deference, and "[w]e do not disturb the trial justice's findings of fact unless it can be shown that he or she has overlooked or misconceived relevant and material evidence or was otherwise clearly wrong." *Curry v. Curry*, 987 A.2d 233, 237–38 (R.I. 2010) (quoting *Schwab v. Schwab*, 944 A.2d 156, 158 (R.I.2008)). "[A] motion to vacate a judgment is left to the sound discretion of the Superior Court justice, and his or her ruling will not be disturbed on appeal absent an abuse of discretion." *Ryan v. Roman Catholic Bishop of Providence*, 941 A.2d 174, 187 (R.I.2008) (citing *Greenfield Hill Investments, LLC v. Miller*, 934 A.2d 223, 224 (R.I.2007) (mem.)).

## III

### Discussion

Sharon asserts that the trial justice committed a number of errors when he denied her Rule 60(b) motion. First, she argues that the trial justice erred when he found that there was no mutual mistake between the parties about the value of Joseph's share in Prime Time when the parties executed the Agreement. Second, Sharon contends that the trial justice erred because the proper date for valuation of the marital assets was on October 31, 2007, the

---

4. Sharon learned about the sale of Prime Time after reading a press release.

5. Rule 60(b) of the Family Court Rules of Procedure for Domestic Relations allows for a relief from judgment or order based on:
   "(1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud * * * misrepresentation, or other misconduct of an adverse party; * * * (6) any other reason justifying relief from the operation of the judgment."

date that final judgment was entered and not March 22, 2007, the date of judicial approval of the Agreement. Lastly, Sharon also maintains that the trial justice erred because he did not recognize the "special status of spousal agreements" when he failed to exercise the court's equitable powers to reform the Agreement or, alternatively, withdraw the court's approval of the Agreement.

### A. Mutual Mistake

It is well settled that a property settlement agreement that has been "incorporated by reference, but not merged into the final divorce decree, retain[s] the characteristics of a contract." *Zaino v. Zaino*, 818 A.2d 630, 637 (R.I.2003) (citing *Riffenburg v. Riffenburg*, 585 A.2d 627, 630 (R.I.1991)); *Lecours v. Lecours*, 792 A.2d 730, 731 (R.I.2002). We also have held that "[f]or a contract to be subject to judicial reformation, the court must first find a mutual mistake." *Gorman v. Gorman*, 883 A.2d 732, 740 (R.I.2005). A mutual mistake is "one that is 'common to both parties wherein each labors under a misconception respecting the *same terms* of the written agreement sought to be [reformed].'" *Merrimack Mutual Fire Insurance Co. v. Dufault*, 958 A.2d 620, 624 (R.I.2008) (quoting *McEntee v. Davis*, 861 A.2d 459, 463 (R.I.2004)). "When a mutual mistake is manifest in the agreement at the time it is entered into, the agreement 'fails in a material respect correctly to reflect the understanding of both parties.'" *Id.* (quoting *McEntee*, 861 A.2d at 463).

Sharon asserts that both she and Joseph relied upon the representation of the value of Joseph's share in Prime Time, as set forth in the Piccerelli appraisal, and that the report failed to properly account for the marketability of his minority share. Sharon argues that the parties' reliance was misplaced because the actual value of Joseph's interest in Prime Time was substantially higher than the amount that had been determined by the appraisal.

The court appointed the Piccerelli firm as a neutral appraiser to value Joseph's 24.59 percent minority ownership interest in Prime Time. Based on all the available information, the appraiser opined that, as of February 2, 2006, the fair value of Prime Time was approximately $15.2 million, and the fair value of Joseph's stock in Prime Time was $4.1 million. After discounting that number to reflect the lack of marketability of a minority ownership,[6] the appraiser valued Joseph's interest in Prime Time at $2.814 million. The appraisal was modified and updated on June 23, 2006; at that time, the estimated value of Joseph's stock was $2.753 million.

It is significant that at that time, negotiations for the sale of Prime Time to Richline had not commenced. When he ruled on Sharon's motion, the trial justice found that there was "no evidence whatsoever that there were any discussions concerning the sale of the company" prior to the execution of the Agreement. Therefore, he reasoned, the appraiser's opinion was not undermined because it did not take into account the later purchase of Prime Time by a subsidiary of Berkshire Hathaway. Before they used the appraisal as a basis for equitably dividing the marital estate, each of the parties was provided the opportunity to obtain a second, separate appraisal, and Sharon availed herself of that opportunity. However, after her own appraisal resulted in a valuation that was less than the court-ordered appraisal, both she and Joseph accepted the original valuation

---

6. The appraisal explained that a "marketability discount" was applied because a minority interest in a closely held company tends to be more difficult to sell.

and incorporated it into the Agreement. The Agreement does not fail in any material respect to correctly reflect the understanding of both parties about the worth of Joseph's minority interest in Prime Time at the time they executed it. In our opinion, a mutual mistake of material fact was not demonstrated here by clear and convincing evidence, and Sharon has not met her burden of proof. *See Gorman,* 883 A.2d at 740 n. 15.

Because there was no mutual mistake of fact regarding the value of Joseph's interest in Prime Time when the Agreement was entered into, and because Joseph did not consent to reformation of the Agreement, the Family Court lacked the power to reform or amend it. *See Paul v. Paul,* 986 A.2d 989, 995 (R.I.2010) ("[A] property settlement agreement such as the agreement here that has been incorporated by reference in, but not merged with, a divorce judgment can be modified only if the parties consent or if a ground for reformation under contract law * * * exists.") (citing *Gorman,* 883 A.2d at 740–41).

## B. The Proper Date for Valuation of Assets

■ This Court has held that "parties to a divorce action remain as husband and wife until the entry of the final decree of divorce." *Janson v. Janson,* 773 A.2d 901, 904 (R.I.2001) (quoting *Giha v. Giha,* 609 A.2d 945, 948 (R.I.1992)). Because the parties remain married through the interlocutory period, and because their property rights in each other's estate continue to exist through that date, we have held that "[t]he final decree date is the terminal date for equitable distribution *'absent an express agreement to the contrary.'* " *Ruffel v. Ruffel,* 900 A.2d 1178, 1185 (R.I.2006) (quoting *Janson,* 773 A.2d at 904) (emphasis added). Significantly, "[p]arties may make an express agreement to change the

terminal date for equitable distribution * * *." *Id.* at 1185.

■ Here, both parties were represented by competent and experienced counsel. They negotiated over a protracted period, engaging in a series of proposals and counterproposals. When the Agreement finally was consummated, it contained an "express agreement" that set the terminal date for equitable distribution as March 22, 2007, when the Agreement formally was approved by the Family Court. *See Ruffel,* 900 A.2d at 1185. Paragraph 17, the dispositive section of the Agreement, states:

"Except as otherwise more specifically provided in this Agreement, all of the property of each of the parties hereto, both real and personal, now owned by him or her, or to which he or she may hereafter become entitled, shall be and remain his or her sole and separate property, free from all rights of the other spouse and party hereto, with power in the party owning such property to deal with or otherwise dispose of the same as if he or she were single. * * * [E]ach of the parties hereto releases and quit-claims unto the other * * * all other rights, statutory or otherwise, in and to any real estate of which such other spouse and party hereto is, or may become seized and possessed, or to which he or she may otherwise be or become entitled. It is the intention of this clause to permit and empower each of the parties hereto to deal with his or her own separate property now owned or hereafter acquired without any let, hindrance, claim, demand or assertion of right of or by the other party and in all respects as if each party hereto were single."

■ In essence, paragraph 17 specifically empowered each party to move on with his or her individual financial life, free of

any claims one spouse might have in the property of the other. Paragraph 19 demonstrates that the parties drafted their agreement cognizant of the principles set out in *Giha*. *See Giha*, 609 A.2d at 948–49. Paragraph 19 says:

> "Each party waives any interest he or she may have in and to any assets acquired by the other party subsequent hereto and prior to the entry of any Final Judgment of Divorce."

Contrary to Sharon's argument that the parties "never expressly agreed to a terminal date," the Agreement convinces us that the parties concurred that during the interlocutory period, property rights may have continued in the estate of the other unless they otherwise provided, and they did so provide. *See Ruffel*, 900 A.2d at 1185. "It is not the function of this Court, or the Family Court, to set aside a property settlement agreement * * * simply because a party no longer wishes to be bound by its terms or is unhappy with the result." *Vanderheiden v. Marandola*, 994 A.2d 74, 78 (R.I.2010). Sharon essentially asks us to rewrite the Agreement to her advantage, and we decline to do so.

## C. Should the Family Court have withdrawn its approval?

Sharon also contends that even if no mutual mistake of fact existed when the Agreement was entered into, the Family Court nonetheless erred because it declined to withdraw its prior approval of the Agreement. *See Gorman*, 883 A.2d at 741. Sharon insists that the Family Court should have withdrawn its approval of the Agreement because it resulted in an inequitable distribution as a result of the increase in the value of Joseph's share of Prime Time. She further asserts that Joseph was required to inform her of the increase in the value of his share before final judgment was entered.

There is no doubt that until the entry of final judgment in a divorce action, spouses have a continuing duty to disclose changes in their financial circumstances. *See Giha*, 609 A.2d at 949. In our opinion, Joseph failed to meet that duty when he did not disclose the expected increase in value of his minority share of Prime Time. During the time between the granting of the divorce and the entry of final judgment, Joseph learned that there were ongoing negotiations with Richline Group and that his 25 percent share in Prime Time was likely worth significantly more than what the Piccerelli appraisal had estimated. When Joseph became aware of the jump in the value of his share of Prime Time, he became burdened with a duty to inform Sharon of this change in his financial circumstances. *See id.* However, even despite Joseph's breach of his duty to disclose, any property rights Sharon had in Joseph's share of Prime Time were foreclosed on March 22, 2007, when the Agreement was executed and approved by the Family Court. *See Ruffel*, 900 A.2d at 1185. In other words, in the circumstances of this case, disclosure by Joseph to Sharon would have changed nothing.

In so holding, we are in no way signaling a retreat from the good-faith rule set out in *Gorman*. *See Gorman*, 883 A.2d at 737. In the absence of the specific terms and judicial approval of the Agreement, Sharon may well have been entitled to share in the increase in the value of Joseph's interest in Prime Time. However, unlike in *Gorman*, in which the defendant husband failed to alert his wife about the existence of considerable shares of stock in his employee stock bonus plan before an agreement was entered into, Sharon and Joseph both were aware of the existence and the value of every asset owned by each party as of the date upon which they had agreed. *See id.* at 736. It is significant that the trial

justice found that at the time of the execution of the Agreement and prior thereto, "there is no evidence whatsoever that there were any discussions concerning the sale of the [C]ompany." The Agreement was fair and equitable when the parties entered into it. *Cf. Zaino*, 818 A.2d at 636 (in which husband committed fraud during the negotiation process leading to the execution of the property settlement agreement). After reviewing the record in this case, we see no indication that the trial justice abused his discretion when he denied Sharon's motion to vacate, and we decline to disturb his ruling on appeal.

## IV

### Conclusion

For the reasons stated in this opinion, we affirm the order of the Family Court and remand the record to that court.

Justice GOLDBERG, dissenting.

Because I disagree with the result in this case and particularly the manner in which the majority reaches that result, I respectfully dissent. This Court has consistently recognized the fiduciary obligations that exist during the marital relationship. "Agreements between spouses, unlike ordinary business contracts, involve a fiduciary relationship requiring the utmost of good faith." *Gorman v. Gorman*, 883 A.2d 732, 737 (R.I.2005) (quoting *Christian v. Christian*, 42 N.Y.2d 63, 396 N.Y.S.2d 817, 365 N.E.2d 849, 855 (1977)). In *Gorman*, the Court adopted this principle as the standard governing "the dealings of spouses who invoke the Family Court's powers for the purpose of obtaining a divorce." *Id.* We recognized that spousal contracts fundamentally are different from ordinary contracts and that the Family Court must monitor such agreements "with special attention and with a concern for the equities of the situation."

*Id.* The special nature of marital property settlement agreements makes judicial approval of the *fairness* of those contracts "a *sine qua non*" of our Family Court jurisprudence. *Id.* at 737–38 n. 7.

In my opinion, the fairness of a marital settlement agreement between divorcing spouses should not be controlled or diluted by reference to other terms in the contract; unfortunately, that is what the majority's approach in this case accomplishes. In a single sentence, the majority dispenses with the fiduciary considerations attendant to this marital property agreement and concludes that "even despite Joseph's breach of his duty to disclose, any property rights Sharon had in Joseph's share of Prime Time were foreclosed on March 22, 2007, when the Agreement was executed and approved by the Family Court." I am not convinced, as the majority holds, that "disclosure by Joseph to Sharon would have changed nothing."

Under the most generous time-line available to Joseph, three months before the entry of the final judgment, he learned that his shares in Prime Time were worth a whopping $2.5 million more (almost double) than the $2.9 million figure in the Agreement. He deliberately withheld this from Sharon. The record discloses that a binding agreement for the sale of Prime Time was executed before the entry of final judgment of divorce and the shares were sold less than two weeks after the entry of final judgment of divorce. The majority acknowledges that Joseph had a duty to disclose this fact during the marriage and that he failed to honor that obligation. However, rather than remand this case to the Family Court "to *review* the Property Settlement Agreement and to withdraw its approval of the Agreement [if] it determine[s] that the Agreement [is] inequitable," *Gorman*, 883 A.2d at 741, the majority concludes that an equitable evalu-

ation of the fairness of the contract is unavailable to this spouse *based on the contract itself.*

The result in this case represents a departure from our venerable principles concerning the mutual fiduciary duties owed by divorcing spouses because the equities of this situation have not been addressed; neither by the Family Court, nor by this Court. Contrary to our holding in *Gorman,* in which we declared unequivocally that the property settlement agreement, "even if reflected in a *completed* and *integrated* and *signed document,* * * * is subject to review and approval by the Family Court," *Gorman,* 883 A.2d at 738 (emphases added), the majority *sua sponte* concludes that such a review is unwarranted.

In this case, Sharon's contention that the Family Court should have withdrawn its approval of the Agreement based on an inequitable distribution of the marital assets as a result of the unexpected (and undisclosed) increase in the value of Prime Time, has been rejected because the majority determined—based on other terms in the contract itself—that review would be fruitless. This circuitous result appears to limit or disregard "the special oversight duties of the Family Court with respect to property settlement agreements," oversight duties that are not confined "to the terms to which [the parties] agreed in a formal written document." *Gorman,* 883 A.2d at 739. Because we are not confronted with an ordinary contractual dispute, but with an agreement "drafted in the context of a divorce proceeding," *id.* at 739–40, our law mandates that "the validity and enforceability of such a contractual agreement between divorcing spouses *must be analyzed differently* from the way in which those aspects of an ordinary bilateral contract would be analyzed." *Id.* at

740 (emphasis added). Because that did not happen in this case, I dissent.