Dorothy CURRY

v.

Andrew CURRY.

No. 2007–347–Appeal.

Supreme Court of Rhode Island.

Jan. 26, 2010.

Lauren E. Jones, Esq., Providence, for Plaintiff.

Robert S. Parker, Esq., Providence, for Defendant.

Present: SUTTELL, C.J.,
GOLDBERG, FLAHERTY, and
ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

The marriage of Andrew and Dorothy Curry, which began in 1968, has been in the throes of dissolution since 1996. Finally, in 2005, a justice of the Family Court granted the parties' divorce petitions and divided their marital assets in accordance with Rhode Island's law of equitable distribution. Even then, certain issues pertaining to the division of their marital property continued to be adjudicated in the Family Court until 2007. The couples' dispute finally has made its way to this Court. On appeal, each contends that the trial justice erred when she determined certain assets and liabilities to be marital and when she divided their marital assets. We hold that the trial justice did not abuse her discretion when she determined the parties' marital estate and equitably distributed it between them. Additionally, we hold that the trial justice did not err when she denied Dorothy's motion seeking revaluation of certain property after the time of trial. For the reasons set forth in this opinion, we affirm the judgment of the Family Court.

## I

### Procedural History

Dorothy Curry, plaintiff, and Andrew Curry, defendant, married on December 8, 1968, in New York. They had three sons during their marriage, all of whom are now adults. Dorothy filed for divorce on April 25, 1996, citing irreconcilable differences resulting in the irremediable breakdown of their marriage. Andrew filed a counterclaim in which he asked the court to deny and dismiss Dorothy's complaint and to grant him a divorce on the grounds of living separate and apart for more than three years and irreconcilable differences. The complaint for divorce was heard on July 8–9, 2004, September 28–29, 2004, November 22–23, 2004, and March 28, 2005, before a justice of the Family Court.

On October 5, 2005, the trial justice rendered a bench decision. First, she granted each party a divorce "on the grounds that they have lived separate and apart * * * in excess of three years." She subsequently determined the couple's marital assets and made an equitable distribution of those assets. The trial justice considered "all the variables in the equitable distribution statute"[1] and the testimony

---

1. The statutory factors set forth in G.L.1956 § 15–5–16.1(a) are as follows:

    "(1) The length of the marriage;
    "(2) The conduct of the parties during the marriage;
    "(3) The contribution of each of the parties during the marriage in the acquisition, preservation, or appreciation in value of their respective estates;
    "(4) The contribution and services of either party as a homemaker;
    "(5) The health and age of the parties;
    "(6) The amount and sources of income of each of the parties;
    "(7) The occupation and employability of each of the parties;

    "(8) The opportunity of each party for future acquisition of capital assets and income;
    "(9) The contribution by one party to the education, training, licensure, business, or increased earning power of the other;
    "(10) The need of the custodial parent to occupy or own the marital residence and to use or own its household effects taking into account the best interests of the children of the marriage;
    "(11) Either party's wasteful dissipation of assets or any transfer or encumbrance of assets made in contemplation of divorce without fair consideration; and
    "(12) Any factor which the court shall expressly find to be just and proper."

given at trial, and determined that the "marital estate should be divided equally."

The decision pending entry of final judgment was entered on April 4, 2007,[2] followed by an amended decision pending entry of final judgment that was entered on August 2, 2007. Final judgment was entered on September 21, 2007. Andrew timely appealed to this Court and Dorothy followed with a cross-appeal.

## II

### Issues on Appeal

On appeal, Andrew submits that the trial justice committed a number of errors when she distributed his and Dorothy's marital property. First, he argues that the trial justice erred when she "fail[ed] to compensate Andrew adequately for actions Dorothy took that substantially reduced the marital estate and injured Andrew financially." Relative to this argument, Andrew contends that the trial justice miscued when she (1) failed to consider a tuition refund that Dorothy "converted to her own use"; (2) failed to consider that Dorothy "dissipated" and "destroyed" the parties' finances when she assigned Dorothy 50 percent of the marital assets; (3) failed to determine that Dorothy's income tax refunds and Andrew's income tax "shortfalls" in 1996 and 1997 were marital assets; (4) failed to consider that Andrew "paid all the marital debt" from April 1996 until June 2002; and (5) failed to consider Andrew's contributions to Dorothy's edu-

cation. He also maintains that the trial justice erred when she assigned Dorothy an interest in a co-op apartment at 7259 Shore Road, Brooklyn, N.Y., and when she found that another co-op at 308 101st Street, Brooklyn, N.Y., was a marital asset.[3]

In response, Dorothy argues that the trial justice, but for one exception, properly distributed the marital property. However, in her cross-appeal, Dorothy contends that the trial justice abused her discretion when she ordered Dorothy to be responsible for half of a loan from Citizens Bank during their marriage on the ground that she was discharged from that obligation because she filed for bankruptcy. Additionally, Dorothy also argues on appeal that the trial justice erred when she declined to "update the values of the marital real estate."

## III

### Standard of Review

"When hearing an appeal from the Family Court, we have said that 'it is not our function to arrive at de novo findings and conclusions of fact based on the evidence presented at trial.'" *Schwab v. Schwab*, 944 A.2d 156, 158 (R.I.2008) (quoting *Moran v. Moran*, 612 A.2d 26, 33–34 (R.I.1992)). "We do not disturb the trial justice's findings of fact unless it can be shown that he or she has overlooked or misconceived relevant and material evi-

2. At oral argument, both parties were at a loss to fully explain why this case has been pending for more than thirteen years. In part, Andrew attributes the delay between the bench decision and entry of the decision pending entry of final judgment in April 2007 to his motion filed on January 11, 2007 "seeking clarification of the Bench Decision." Andrew also had filed another motion on October 23, 2006, which sought access to the Narragansett home to retrieve personal items

and a restraining order against Dorothy to prevent her from "disbursing any funds received from the parties' insurance carrier" without first consulting Andrew.

3. A co-op is an abbreviation for a cooperative, which is an apartment building "owned by its residents, to whom the apartments are leased." Black's Law Dictionary 384 (9th ed.2009).

dence or was otherwise clearly wrong." *Id.* (quoting *Oduyingbo v. Oduyingbo,* 685 A.2d 280, 280 (R.I.1996) (mem.)). Accordingly, "[w]hen the parties contest the equitable distribution of marital assets, 'this [C]ourt will not disturb the trial justice's findings where he or she has scrupulously considered all of the elements set forth in * * * [G.L.1956] § 15–5–16.1.'" *Ruffel v. Ruffel,* 900 A.2d 1178, 1184 (R.I.2006) (quoting *Tarro v. Tarro,* 485 A.2d 558, 560 (R.I.1984)). We will vacate the equitable distribution and remand the case "for a rehearing where the trial justice overlooks salient uncontradicted evidence in determining the amount of assets to be distributed." *Id.* (quoting *Stephenson v. Stephenson,* 811 A.2d 1138, 1142 (R.I.2002)). However, when this Court reviews questions of law in an appeal from the Family Court, "we must apply a de novo review." *Schwab,* 944 A.2d at 158 (citing *Gorman v. Gorman,* 883 A.2d 732, 738 n. 8 (R.I.2005)).

## IV

## Discussion

■ "In dividing property, a trial justice must decide which assets are marital property, consider the contribution of each party, and then distribute the property." *Stephenson,* 811 A.2d at 1143 (quoting *Stanzler v. Stanzler,* 560 A.2d 342, 345 (R.I.1989)). Such determination of the parties' marital property and its equitable distribution is within the "sound discretion of the trial court." *DiOrio v. DiOrio,* 751 A.2d 747, 750 (R.I.2000) (quoting *Murphy v. Murphy,* 714 A.2d 576, 579 (R.I.1998)). When doing so, the trial justice "is obligated to consider the factors * * * in * * * § 15–5–16.1." *Id.* In addition to the distribution factors set forth in G.L.1956 § 15–5–16.1(a), § 15–5–16.1(b) prohibits the trial justice "from assigning three categories of property": (1) "property * * * held by the party prior to the marriage"; (2) "proper-ty or an interest in property which has been transferred to one of the parties by inheritance before, during, or after the term of the marriage"; and (3) "property or an interest in property which has been transferred to one of the parties by gift from a third party before, during, or after the term of the marriage." *Ruffel,* 900 A.2d at 1187 (quoting § 15–5–16.1(b)). Further, "[a]s long as this Court is able to review a lower court's decision and to determine therefrom that all the necessary facts and statutory factors were considered," the trial justice need not "explicitly list [ ] his or her findings on each factor." *Chiappone v. Chiappone,* 984 A.2d 32, 37 (R.I.2009) (quoting *Gervais v. Gervais,* 688 A.2d 1303, 1308 (R.I.1997) (*Gervais I* )).

## Andrew's Appeal

### A

### Dorothy's Alleged Financially Harmful Actions

■ The majority of Andrew's appeal is premised on his argument that the trial justice failed to compensate him adequately for certain actions of Dorothy that Andrew asserts "substantially reduced the marital estate" and caused him financial harm, particularly in relation to his business, Connect Corporation. As an initial matter, we note that the trial justice said that she "consider[ed] all the variables in the equitable distribution statute." Although the trial justice did not delineate those factors with the precision we like to see, a review of the record nonetheless indicates that she reflected upon each relevant factor set forth in the equitable distribution statute, including the eleventh factor, which directs the trial justice to consider "[e]ither party's wasteful dissipation of assets or any transfer or encumbrance of assets made in contemplation of divorce without fair consideration." Section 15–5–16.1(a)(11); *see Olivieri v. Olivi-*

*eri,* 760 A.2d 1246, 1250 (R.I.2000). We hold that the trial justice did not abuse her discretion when she made her factual findings and when she distributed the parties' marital property according to the statutory factors enumerated in § 15–5–16.1(a).

## 1

### Tuition Refund

■ One of the parties' three sons attended Vanderbilt University in Tennessee in September 1997. Although the parties previously had paid such obligations from joint assets, Dorothy prevailed on Andrew to take out a loan in his name to pay for the Vanderbilt tuition. In late October 1997, their son withdrew from the university because of an illness. As a result, the trial justice found that the university made a partial refund of the tuition to Dorothy, despite Andrew's having obligated himself through the loan. Dorothy testified that she did not recall receiving the refund, nor did she recall its amount. According to Andrew, the amount refunded was about $15,000.

The trial justice found that the rebate of the tuition payment "more properly should have gone to" Andrew. However, she ruled that the amount of the refund would be deducted from Dorothy's share of the marital estate only if Andrew could "determine the exact amount of the monies received by" Dorothy. Andrew contends that this was error, and that the trial

justice should have required Dorothy to reimburse Andrew for half of his obligation on the debt because she "caused" the debt and prevented him from reducing the loan balance with the refund. Alternatively, Andrew argues that the trial justice unfairly allocated the burden of determining the exact amount of the refund to Andrew instead of to Dorothy, who received it.

In our view, the trial justice did not abuse her discretion, because there simply was insufficient evidence presented at trial from which the trial justice could have made the distribution that Andrew argues would have been most proper. Therefore, a review of the record reveals that the trial justice did not "overlook [ ] salient uncontradicted evidence in determining the amount of assets to be distributed." *Ruffel,* 900 A.2d at 1184 (quoting *Stephenson,* 811 A.2d at 1142). We cannot say that the trial justice abused her discretion when she assigned responsibility to satisfy the loan to Andrew, but at the same time required him to prove the amount of the rebate that Dorothy had retained before it could be deducted from Dorothy's share of the marital assets. Andrew had particular incentive during trial to supply specific information about the refund amount so that he could be reimbursed, yet failed to do so.[4] Thus, the trial justice was limited to considering the evidence produced at trial, which consisted of Andrew's mere conjecture that the rebate amounted to $15,000.[5] Nonetheless, the trial justice

4. Additionally, Andrew did not file a motion with the Family Court during trial requesting an order that Dorothy pay the tuition with money from the couple's joint account, which she controlled. Rather, Andrew deferred seeking a remedy until this appeal, more than a decade after trial began.

5. Interestingly, Andrew now characterizes the amount of the rebate as "buried by the sands of time." This further bolsters our view that

the trial justice did not abuse her discretion when she declined to give weight to Andrew's testimony about the $15,000 rebate. It is unclear why the parties simply did not inquire of the university about the exact amount of the rebate. At oral argument, counsel for Andrew represented that the university had been contacted, but the amount refunded was still undetermined.

generously afforded Andrew additional time to prove the amount of the rebate after trial. Therefore, we hold that the trial justice did not overlook or misconceive the evidence available to her, and we decline to disturb this portion of her decision on appeal.

## 2

### Individual Tax Returns

■ The couple filed a joint tax return for 1995. They incurred a tax liability for that year because Andrew did not withhold sufficient money from his income to satisfy the amount that they owed in taxes. In 1996 and 1997, Dorothy filed her tax returns individually.[6] Dorothy testified that she chose to do so because Andrew again failed to withhold sufficient funds and she "couldn't really rely on some numbers." As a result of their filing individually and not jointly, Dorothy received a refund and Andrew incurred a substantial tax liability.

Andrew argues that the trial justice should have found that Dorothy's refunds and Andrew's liabilities were marital assets that were subject to equitable distribution. He maintains that the trial justice should have assigned to him an amount representing an equal share of Dorothy's refunds and to her an equal share of his liability. Dorothy argues that the trial justice "correctly refused to alter the equitable distribution award to compensate Andrew for his tax penalties" because her findings "were supported by the evidence and were not clearly wrong." We agree with Dorothy and do not disturb the trial justice's ruling.

■ The trial justice acknowledged that Dorothy's decision to file separately from Andrew for two years caused him to owe "significant" amounts to the IRS. Further, she noted that the parties' joint properties were sold to "pay down" a business debt to Citizens Bank, "only to have those monies levied by the IRS to pay [Andrew's] overdue taxes which were overdue, in no small measure, due to [Dorothy] filing separately for two significant tax years, '96 and '97." However, the trial justice considered these facts when she ruled that Dorothy would be responsible for half of the Citizens Bank loan. This Court will not disturb the trial justice's assignment of property unless her decision clearly was wrong. *Schwab*, 944 A.2d at 158. In our view, the trial justice did not overlook or misconceive the relevant evidence about the reasons for and impact of Dorothy's filing her taxes singly for two years, and thus her findings of fact are entitled to great weight. Therefore, we cannot say that the trial justice was clearly wrong when she determined that the impact of the parties' individual tax filings was appropriately addressed through her assignment of partial responsibility to Dorothy for the Citizens Bank loan.

## 3

### Evidence of Dorothy's Dissipation of the Marital Estate

■ In April 1987, after wearying of the travel required of him in his position in the corporate world, Andrew established his own telemarketing business, which was incorporated in Rhode Island as Connect Corporation. Andrew was president of Connect Corporation and was its majority shareholder. At the corporation's inception, Dorothy contributed to the venture by "typing proposals at [her] kitchen ta-

---

6. The record is unclear as to why the parties resumed filing their tax returns jointly in 1998 and for how long they continued to do so until the entry of the final judgment of divorce.

ble." [7] Dorothy was employed by Connect Corporation in various capacities in what she described as "support" positions. She also served as treasurer of Connect Corporation from 1994 to 1996. Eventually, she became a shareholder in Connect Corporation.

In August 1995, Andrew desired to computerize Connect Corporation's office in Rhode Island. Although Dorothy was reluctant to upgrade the business's technology before it was necessary, Connect Corporation took out a loan from Citizens Bank to purchase the new equipment, and Dorothy and Andrew personally guaranteed the loan.

In 1995, Connect Research was incorporated in Rhode Island. Dorothy served as secretary for Connect Research and later as its treasurer. Her sister, Rose Marie Hurrell, was president of Connect Research from February 1995 until August 1996, and she also held a 55 percent ownership interest.[8] As president, Ms. Hurrell hired a separate accounting firm in New York, and she maintained the corporation's books and records. Ms. Hurrell testified that she established a bank account for Connect Research with a New York bank and that she deposited into that account money that she had withdrawn from Connect Research's Rhode Island account. In what she described as an effort to take control of Connect Research, Andrew filed a lawsuit against Ms. Hurrell in

Rhode Island and alleged that she had misappropriated funds.[9] Andrew said that he believed that Dorothy was involved with her sister in the embezzlement of company funds.

In July 1996, Andrew sought to refinance Connect Corporation with Citizens Bank, but Dorothy declined to participate in the refinancing effort and would not take part in discussions with the bank.[10] As a result, Andrew was unable to obtain alternative financing. This, he contends, contributed in part to the corporation filing for receivership in 1997.

Andrew argues that the trial justice failed to consider Dorothy's actions, which he contends precipitated their business's insolvency, when she assigned to Dorothy 50 percent of the marital estate. In particular, Andrew contends that Dorothy's refusal to cooperate in settling the Citizens Bank debt, her filing for personal bankruptcy,[11] and her "dismantl[ing]" of Connect Research "in concert with her sister" destroyed the parties' finances. In response, Dorothy argues that Andrew's version of the facts omits the fact that Andrew lacked control of Connect Research both before and after Dorothy had already filed her divorce petition, and that Dorothy did not discuss a "plan" to divorce him with her sister because their April 1996 meeting occurred after she already had filed for divorce. Further, she maintains that it actually was Andrew who "disman-

7. She also worked part time in real estate sales for approximately five years, until 1989.

8. According to Andrew, a client informed him that he would receive preferential treatment if a woman was a majority stockholder. This, along with his feeling that she was "reliable" and produced "quality" work, prompted him to name Ms. Hurrell as president and majority stockholder of Connect Research.

9. The lawsuit later was settled after the expenditure of substantial money.

10. Since Connect Corporation failed, Andrew has been employed by Volt Information Science. Dorothy held several part-time jobs and began working full time in 1999. Currently, she is a teacher in the Providence Public Schools.

11. On May 31, 2002, Dorothy filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the District of Rhode Island.

tled" Connect Research because he engaged in expensive litigation in an effort "to wrest control of Connect Research from Hurrell." Thus, Dorothy maintains, the trial justice's findings of fact were not clearly wrong and her distribution of the marital estate "on a 50–50 basis" should be upheld.

The trial justice found that there were "no allegations of misconduct against [Dorothy], other than her husband's belief that she was not supportive of Connect Corp." She said she was "unclear as to · whether [Andrew] believed his wife knew" that her sister, Hurrell, had transferred approximately $160,000 to a New York bank account from Connect Research's Rhode Island account.[12] Additionally, the trial justice also found that Dorothy was "evasive" when cross-examined regarding Connect Research. Further, the trial justice acknowledged Dorothy's failure to participate in settling the debt with Citizens Bank when she assigned half that outstanding liability to Dorothy. It is our opinion that these findings are supported by the record, and that the trial justice did not overlook or misconceive the evidence, nor was she clearly wrong.

### 4

### Evidence of Andrew's Payment of Marital Debt

■ On April 25, 1996, Dorothy secured an *ex parte* restraining order, which provided that the parties were not precluded "from paying bills and/or operating the parties' business entities in the ordinary course of business." Subsequently, on May 3, 1996, Dorothy obtained a preliminary injunction that vacated the *ex parte*

restraining order and said that "the parties may incur and shall pay all of those marital bills, debts, charges, and other obligations as they have in the past with each party contributing * * * in the same approximate percentage that said party had maintained prior to the parties' separation." As a result, Andrew's and Dorothy's salaries, at that time $300,000 and $140,000 respectively, continued to be deposited into their joint account, over which Dorothy maintained control.

In her decision, the trial justice acknowledged that the restraining order prevented Andrew from getting access to their joint accounts; indeed, she found that Andrew "was effectively hobbled" as a result of the injunctive relief. The trial justice noted that, as a result, Dorothy was left "with the duty to pay the expenses." Andrew argues that the trial justice erred when she did not consider Andrew's payment of the marital debt and obligations from April 1996 until June 2002. He contends that these contributions "properly should have resulted in an equitable distribution award more favorable to" him; he suggests that a grant to him of 60 percent of the marital estate, rather than 50 percent, would be more appropriate. Dorothy maintains that Andrew's assertion that he satisfied all the couples' financial obligations during this time period is inaccurate.

In our opinion, the trial justice did not misconceive or overlook material evidence, specifically evidence of the manner in which the marital debt was paid. When she considered the required statutory factors, many other aspects of the parties' relationship entered into her calculus when she divided the marital estate equally, in-

---

12. Andrew testified that he didn't know for sure whether Dorothy "physically met with her sister" but he "[knew] that [they] had conversations." Dorothy testified that Andrew left her apologetic voicemails expressing that he was mistaken that she was involved with her sister in the transfer of funds. Andrew did not recall leaving a message on Dorothy's machine that he was "happy you weren't dishonest and you didn't betray me."

cluding the couple's "long marriage" spanning thirty-seven years, their mutual contributions in raising their three children, that "both worked long and hard on" Connect Corporation, and also Andrew's concession that he verbally abused Dorothy.[13] We afford her findings their due weight and decline to disturb her distribution of 50 percent of the marital estate to Andrew, rather than the 60 percent he contends would have been most proper.

## 5

### Evidence of Andrew's Financial Contributions to Dorothy's Education

■ After her children were born, Dorothy attended college two evenings a week over the course of two years. She later attended the University of Rhode Island and then took courses at New York University from January until May of 1996. Dorothy's education was intended to enable her to be more effective in her roles at Connect Corporation, benefiting Andrew as well as herself. Dorothy also testified that when she attended the University of Rhode Island, her children were older, enabling her to maintain employment as a real estate agent, and enhancing her ability to contribute to the family's financial well-being.

Andrew argues that the trial justice failed to take into account his financial contributions to Dorothy's education. In response, Dorothy argues that the trial justice did, in fact, consider Andrew's contributions to Dorothy's education when she distributed the marital property. This, she maintains, is reflected in the trial justice's specific acknowledgement of Andrew's support for Dorothy's education. Indeed, in her decision, the trial justice

awarded half of Dorothy's teacher pension to Andrew.

The trial justice said, "In terms of their assisting each other with education, clearly, [Andrew], even after [Dorothy] filed for divorce, continued to contribute to her continuing education." This finding is supported by the record. Therefore, although the trial justice's treatment of Andrew's contribution to Dorothy's education was brief, it is our opinion that the trial justice sufficiently considered it, as she was required to do by statute, and she did not overlook or misconceive relevant evidence. *See Olivieri*, 760 A.2d at 1250 (holding that the magistrate adequately "enumerated and discussed each factor, even if briefly" when he distributed marital property).

## B

### 7259 Shore Road

■ After they married, the Currys lived in Brooklyn, N.Y. In 1981, the family moved to Narragansett, R.I. However, they retained ownership of the co-op apartment at 7259 Shore Road, Brooklyn, N.Y. The trial justice found that the co-op at 7259 Shore Road was a marital asset and awarded Andrew "all right, title, interest, and ownership to the co-op," subject to his paying to Dorothy one-half of the equity in the unit.

Andrew argues that the trial justice erred when she assigned Dorothy one-half of the equity in the co-op at 7259 Shore Road because Dorothy relinquished any interest that she had in that property when she filed for personal bankruptcy and thus, under bankruptcy law, she "no longer had any legal or equitable interest in it whatsoever." Conversely, Dorothy argues that the trial justice did not err when she awarded Andrew the co-op while

13. The trial justice also determined that, contrary to Dorothy's allegations, Andrew was not physically abusive toward Dorothy during their marriage.

at the same time awarding half its value to Dorothy, because the co-op remains in Andrew's possession and was purchased with marital funds. After careful review of the record, we are of the opinion that the trial justice was not clearly wrong when she divided the equity in the Shore Road property between the parties.

■ Although Dorothy's bankruptcy filing divested her of any legal and equitable interest in the co-op, Andrew's reliance on *In re Robison*, 74 B.R. 646 (Bankr. E.D.Mo.1987) to support his contention that the trial justice erred when she assigned Dorothy interest in the property is misplaced. The court in *Robison*, 74 B.R. at 648, held that Chapter 7 debtors have no right to sell property in their bankruptcy estates because they do "not have incentive to maximize the sales price" as would the bankruptcy trustee. But here, Dorothy is not attempting to sell the coop and we believe that the trial justice was correct when she distributed half its value to Dorothy as marital property. Moreover, we have held that although a bankruptcy court's order may be final between the debtor and third parties, the order is not final concerning divorcing spouses. *Hopkins v. Hopkins*, 487 A.2d 500, 504 (R.I.1985). Thus, the Family Court is free to distribute marital property or debt between divorcing spouses despite the existence of a bankruptcy court order divesting one of them of an interest in the property. *See id.*

The record shows that the parties lived as husband and wife at the Brooklyn property and raised their children there before they moved to Rhode Island. Additionally, the parties retained the residence after their move to Rhode Island and used marital funds to purchase it in 1987. We can-

not say that the trial justice "overlook[ed] salient uncontradicted evidence" when she determined the co-op to be marital property and assigned Dorothy a one-half interest in its equity. *Ruffel*, 900 A.2d at 1184.

## C

### 308 101st Street

■ In 1986, Andrew and his two sisters purchased a co-op at 308 101st Street, Brooklyn, N.Y., for their mother's residence, and they agreed to pay the mortgage in one-third shares. The record reveals that title to that property was in the names of Andrew and his sisters from the time it was purchased until they sold their interests in the co-op in the spring of 2009.[14] Dorothy could not recall who made the down payment when the property was acquired, but Andrew testified that his mother paid it. Each month, the Currys paid Andrew's mother $200, which she would put toward the mortgage loan on the co-op. Andrew's sisters likewise each paid their mother $200 as their monthly share. Andrew's mother continued to live in the co-op until her death. Significantly, the parties listed the property on their joint tax returns each year. In her decision, the trial justice found Andrew's share of the co-op at 308 101st Street, Brooklyn, N.Y., to be a marital asset.

Andrew argues that the trial justice erred when she determined that this property was a marital asset because Andrew "inherited [the property] from his mother." Dorothy argues in response that the trial justice properly found the property to be a marital asset because the testimony of both parties established that they paid $200 toward the mortgage each month, which represented their one-third share,

---

**14.** According to Andrew, he and his sisters received $185,000 in the sale, and his share of the proceeds approximated $33,000 after closing costs, but prior to his payment of capital gains taxes.

they listed the property on their joint tax returns annually, and the title was held in the siblings' names since 1986, when the property was purchased. She maintains that Andrew's assertion that he inherited the co-op from his mother is not supported by the record. After careful review of the record, we agree with Dorothy and hold that the trial justice was not clearly wrong when she found that one-third the value of the property at 308 101st Street was marital property.

## Dorothy's Cross–Appeal

### A

### Citizens Bank Loan

■ After Connect Corporation went into receivership in 1997, Andrew met with Citizens Bank in an effort to work out the outstanding business debt that he and Dorothy personally had guaranteed. Andrew testified that Dorothy "wasn't willing to participate" in the meeting, and no settlement affording them relief was reached. As a result of Dorothy's 2002 bankruptcy filing, she no longer had any obligation to Citizens Bank on the loan. The trial justice found that, although Dorothy was discharged of that debt as a consequence of her bankruptcy filing in 2002, Dorothy was nonetheless "responsible to reimburse [Andrew] for her one-half of that debt."

In a flip worthy of an Olympic gymnast, Dorothy argues in her cross-appeal that the trial justice erred when she ordered Dorothy to pay one-half of the debt owed on the Citizens Bank loan. She contends that her obligation to honor her guarantee of the loan was discharged as a result of her bankruptcy and because that obligation involved neither alimony nor support, it was error to order her to reimburse Andrew for half of the debt. In a response equally impressive as a complete reversal of his position on the Shore Road co-op, Andrew argues that although a debt may be discharged in bankruptcy between the debtor and third-party creditor, the Family Court may assign such discharged debts between divorcing spouses. We agree with Andrew and hold that the trial justice did not err when she ordered Dorothy to pay one-half of the outstanding loan.

■ As we have explained above, although a Bankruptcy Court order that discharges a debt is final concerning a spouse-debtor and third-party creditors, it is not final between divorcing spouses. *Hopkins*, 487 A.2d at 504. However, Dorothy argues that *Hopkins* is distinguishable from this case because *Hopkins* dealt with a conditional waiver of alimony, while here, alimony is not at issue. *See id.* at 502. In *Hopkins*, 487 A.2d at 502, the final judgment dissolving the Hopkins' marriage provided that the former wife waived alimony on the condition that her former husband indemnify her if she became liable on certain debts. Subsequently, the husband filed for bankruptcy and the Bankruptcy Court ruled that the debts "were the result of a property settlement rather than an award of alimony and, hence, ordered the debts discharged." *Id.* The Family Court ordered the husband to indemnify the wife pursuant to the conditional waiver of alimony set forth in the divorce decree despite the discharge in bankruptcy. This Court affirmed, because the discharge of the husband's "obligations to third-party creditors in no way released him from the obligations assumed under the original Family Court decree." *Id.* at 505.

■ Dorothy's discharge in bankruptcy as to the Citizens Bank loan freed her from her obligation as to Citizens Bank. We agree with her that equitably distributed debts that are meant as a property settlement rather than for support of the former spouse are dischargeable in bank-

ruptcy. *In re McCartin*, 145 B.R. 118, 119 (Bankr.D.R.I.1992). However, this did not preclude the Family Court from requiring Dorothy to indemnify Andrew for a portion of the debt after it weighed the statutory factors governing equitable distribution. *See Hopkins*, 487 A.2d at 504. The trial justice gave careful thought to Dorothy's refusal to participate in the negotiations on the Citizens Bank loan when she found Dorothy to be responsible for half that debt. It was within the discretion of the trial justice to assign half that debt to Dorothy, and we hold that she did not abuse her discretion when she did so.

## B

### Revaluation of Marital Estate

■ Before she issued her bench decision on October 5, 2005, the trial justice said that she had given the parties six weeks after the trial to submit more current appraisals of the real property in the marital estate. Notwithstanding that latitude, Andrew did not submit appraisals until October 3, 2005, and Dorothy's appraisals "flew in" on October 5, 2005; thus, both were submitted well beyond the six-week time limit.[15]

On April 13, 2007, Dorothy moved under Rule 59 of the Family Court Rules of Procedure for Domestic Relations, that the trial justice "determine the present fair market values of all three (3) parcels of real estate and their present balances of the mortgages" and that she order that the amount of Dorothy's interest in the two New York co-ops be deducted from Andrew's interest in the Narragansett real estate because of the time lapse between the hearing on October 5, 2005, and the decision pending entry of final judgment in April 2007. As a result of that delay, Dorothy argued, "the value should be tak-

en into account at the time of the actual distribution." On June 11, 2007, the trial justice held a hearing with regard to Dorothy's motion and ruled that the proper time for valuation of the marital assets is at the time of the hearing on the complaint for divorce and she declined to revisit the value of the marital estate.

Dorothy argues that the trial justice erred when she refused to accept professional appraisals of the marital estate both at the time of the bench decision and when she denied Dorothy's Rule 59 motion. Dorothy maintains that the proper time to value the property is at the time of judgment, which was not entered in this case until nearly two years after the bench decision, and that the trial justice therefore erred when she declined to accept the professional appraisals and instead relied on Andrew's "unreliable" testimony about the value of the New York and Rhode Island real estate. Conversely, Andrew argues that the trial justice properly valued the properties as of the time of trial, and thus she did not err when she declined to revalue them at a later date. We agree with Andrew, and hold that the trial justice committed no error when she declined to accept the parties' appraisals before she issued her bench decision and later when she denied Dorothy's Rule 59 motion.

■ This Court has held that "marital assets should be valued as of the date of trial unless there are compelling circumstances warranting a deviation." *Gervais v. Gervais*, 735 A.2d 214, 214 (R.I.1999) (mem.) (*Gervais II*) (attributing this rule to our holding in *Gervais I*) (citing *Saback v. Saback*, 593 A.2d 459, 461 (R.I.1991) (holding trial justice should "distribute the marital assets at the time of trial" and ordering assessment of assets "as of the time of the entry of judgment" where trial

---

**15.** The six-week period set by the trial justice expired on May 10, 2005.

justice's bench decision distributed assets that were nonexistent at that time) and *Briceno v. Briceno*, 566 A.2d 397, 397 (R.I. 1989) (holding that "in the absence of compelling circumstances * * * the trial justice should value marital assets as of the time of trial")); *see also Gervais I*, 688 A.2d at 1308 (holding that trial justice erred when he valued "the marital estate * * * prior to the trial"). We acknowledge that we also have referred to the appropriate time for valuation as the time of "final" judgment or order. *Ruffel*, 900 A.2d at 1187 (holding that date of "the final order resolving the * * * equitable-distribution issues" was appropriate valuation date); *Cardinale v. Cardinale*, 889 A.2d 210, 228 (R.I.2006) (holding wife's interest in certain property should be determined on date of final judgment). However, although *Ruffel* and *Cardinale* refer to the date of "final" judgment or order as the proper time for valuation, these dates were also "when all the equitable issues were purported to be resolved," rather than the when the final judgment of divorce was entered. *Ruffel*, 900 A.2d at 1186–87 (divorce final on December 16, 2002, but equitable distribution unresolved until December 29, 2003, order following November 26, 2003, bench decision) (citing *Cardinale*, 889 A.2d at 228); *Cardinale*, 889 A.2d at 220 (divorce final on April 1, 2003, with final judgment resolving all equitable issues entered on June 1, 2004). Therefore, the proper date for valuation of marital assets is at the time when all equitable issues are resolved, which in divorce cases, should be at the time of trial. *See Cardinale*, 889 A.2d at 228 (holding that bifurcated proceedings are inappropriate in divorce cases and "all the issues between the parties shall be adjudicated in a single proceeding").

Here, the trial justice did just that on October 5, 2005, when she purported to resolve all issues relating to the equitable distribution of the parties' marital property. In doing so, she properly valued the real estate based on the evidence produced at trial. Unlike the situations in *Ruffel* and *Cardinale*, in which the final divorce decrees were entered before the equitable distribution issues were resolved, the Currys' divorce became final after the trial justice had distributed the marital assets and liabilities between them. In this case, because no written order memorializing this October 5, 2005, bench decision was entered, and because the decision pending entry of final judgment, entered on April 4, 2007, refers back to the bench decision, we hold that October 5, 2005, was the appropriate date for valuation of the assets. *See Ruffel*, 900 A.2d at 1182, 1186–87 (holding date of final order resolving the equitable distribution, which was issued approximately one month after the bench decision, was the appropriate termination date for the valuation of assets). This is so because that is the date when the issues were resolved.

Further, the trial justice did not abuse her discretion when she declined to accept belated offers of valuations before she issued her bench decision. The trial justice afforded the parties ample time to submit more recent appraisals, but they did not do so. Therefore, the trial justice did not err when she relied on the evidence of the property values as was adduced during the trial, because this was the only information on the record when she made her decision.

Nor did the trial justice err when she denied Dorothy's Rule 59 motion requesting that the trial justice revalue the properties because of the lapse of time between the bench decision on October 5, 2005, and the decision pending entry of final judgment on April 4, 2007. The trial justice properly valued the property at the time of trial, when all equitable issues were resolved and, in our view, no compelling

circumstances exist to warrant deviation from this "usual date of valuation." *Gervais II*, 735 A.2d at 214. We are not persuaded by Dorothy's argument that the lapse of time, "the fluctuation of the real estate market," or the assertion of "the questionable reliability of the * * * owner opinion valuations" used in the bench decision are sufficiently compelling to warrant deviation from the usual date of valuation. *Id.* (holding that "mere allegations are not sufficient to justify a deviation"). It is time for this litigation to end. This couple, who married in 1968, have been involved in divorce proceedings since 1996, a period of thirteen years. Such an unconscionable delay serves no one's interest, and is repugnant to the interests of justice.

### Conclusion

For the reasons stated in this opinion, we affirm the judgment of the Family Court and remand the record to that court.