March 14, 2018

**Supreme Court**

No. 2017-49-Appeal.
(K 15-592)

Simeng Wu-Carter          :

      v.                  :

Thomas G.J. Carter.        :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Simeng Wu-Carter          :

v.                        :

Thomas G.J. Carter.       :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Flaherty, for the Court.**  The defendant, Thomas Carter, appeals from a Family Court decision pending entry of final judgment following a divorce proceeding.  The trial justice found the marital estate to be virtually nonexistent, with most of the disputed assets belonging solely to the plaintiff, Simeng Wu-Carter.  Thomas disagrees with that finding; he argues that the trial justice erred in not identifying certain assets as marital property, which would have been subject to equitable distribution upon divorce.[1]

This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After considering the parties' written and oral submissions and after reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument.  For the reasons set forth below, we affirm in part and vacate in part the

---

[1] To avoid confusion, we refer to the parties by their first names.  No disrespect is intended.

Family Court decision pending entry of final judgment, and remand for further proceedings not inconsistent with this opinion.

## I

## Facts and Travel

### A

### The Marriage and Its Dissolution

It appears that the short-lived marriage between Simeng and Thomas was doomed from "I do." The couple met in the summer of 2012 via an online dating service. Just a few short months later, they planned to wed on October 20, 2012, on Cape Cod. Turmoil arose shortly before the wedding, however, when Thomas revealed to Simeng that, in fact, they could not be legally married at that time because his divorce from his third wife had yet to be finalized in California.

Not surprisingly, this fact caused Simeng, a Chinese citizen, significant distress. Her visa, allowing her to remain in the United States, was scheduled to expire in February 2013, and this surprising and unwelcome hitch in her plans to marry Thomas meant she would soon lose her status to remain lawfully in this country. According to Simeng, she "was deceived" by Thomas as to his legal ability to marry her. She testified that he had assured her that his lawyer would be able to backdate his divorce so that their wedding would result in a valid marriage. This apparently false assurance—further complicated by the fact that Simeng had already made arrangements for her parents to travel from China for the nuptials—led the two to go through with their planned wedding ceremony, even though it would not result in a legal marriage.

Eventually, on October 7, 2013, Simeng and Thomas were officially married in Rhode Island. It was at that point that Simeng and Thomas were able to move forward with an

application for Simeng's temporary two-year green card.[2]  There were two requirements for Simeng to obtain a green card: first, she had to be legally married to an American citizen, and second, her spouse had to sponsor her.  By the time she submitted her application in December 2013, Simeng and Thomas were legally married.  But other shortcomings relating to Thomas's sponsorship caused delay.

For Thomas to have qualified as Simeng's sponsor, there was a requirement that his income be 125 percent above the poverty line for the applicable family size to show that he could support her financially.  At that time, Simeng was living with Thomas and his three minor children from his second marriage; the poverty line for a family of five in 2014 was $27,910. Accordingly, Thomas required $34,887 in income to qualify as Simeng's sponsor.  But he did not earn that amount, so Simeng and Thomas had to find another way to demonstrate his financial capacity to support her.  One way to do so was to prove that Thomas had assets in his name totaling five times the difference between the above required income and his actual income.  All told, this calculation amounted to $99,435 in assets.  Unfortunately, Thomas did not meet that qualification either.

As a result, Simeng turned to her parents for help.  Simeng's parents agreed to wire-transfer $100,000 to her so that she could effectuate Thomas's qualifying as her sponsor.  By then, Simeng's visa had expired; therefore, she was unable to open a bank account in her own name.  For that reason, Thomas added Simeng's name to his preexisting Bank of America account, and her parents wired the money (in two $50,000 payments) to Thomas and Simeng's newly-joint bank account.  Now, with a bank statement evidencing $100,000 in assets on hand, Thomas was able to prove that he had the requisite assets to qualify as his wife's sponsor.

---

[2] A green card, or "Permanent Resident Card," allows a resident alien to live and work in the United States.

Shortly thereafter, in April 2014, Simeng's green card application was approved. She began working and immediately opened checking and savings accounts with Bank of America in her own name, into which she deposited her paychecks. Simeng also took $30,000 of the $100,000 that her parents had transferred to her and deposited it into her individual savings account; she deposited another $8,000 of that money into her checking account. She then wired the remaining $62,000 back to her parents' Bank of China account. According to Simeng, Thomas was aware of these transfers from their joint bank account and he did not object.

However, the personal relationship between the couple had begun to unravel. By the spring of 2014, Simeng and Thomas were, in essence, leading separate lives. As Simeng explained it, Thomas and his children lived upstairs in the house, while she lived alone in the half-finished basement. She went upstairs only to use the bathroom; she bought a table, hot plate, couch, and toaster oven, and ate her meals in the basement next to the washing machine and dryer. Simeng testified that she paid all her own living expenses, including her car, gas, automobile insurance, health insurance, and groceries. On the other hand, Thomas testified that he paid for "[e]verything." Simeng kept her money completely apart from Thomas's, and she did not withdraw from or deposit into the joint bank account. Occasionally, Simeng said, she would give Thomas money if he had run out of funds, because he did not have a stable job. Thomas did receive monthly social security payments, which he deposited, along with any and all other income, into the joint bank account.

Simeng and Thomas each testified to myriad troubles plaguing their relationship. She said the troubles first began when she learned that Thomas's divorce was not finalized. Yet even after they were actually married and Simeng had obtained her green card, she described enduring anger and jealousy from Thomas every time she left the house. That, according to Simeng, led to

verbal altercations as well as physical assaults at the hands of Thomas. She said that she never reported him to the police because of various threats that he made. Thomas, on the other hand, placed the blame on Simeng. No matter what the topic, he said, she would frequently have violent outbursts: "she scratched, she bit, she threw things, she smashed things, [and] she was verbally abusive." Thomas described suffering emotional abuse from Simeng, who told him that he had to choose between her and his children. Simeng moved out of the marital domicile in November 2015.

On December 18, 2015, Simeng filed a complaint for divorce, citing irreconcilable differences between her and Thomas that had caused the irremediable breakdown of their marriage. On June 3, 2016, Thomas filed a counterclaim for divorce, citing the same grounds. In October 2016, a trial was held in the Family Court.

**B**

**The Trial Justice's Analysis**

The trial justice issued a bench decision on October 31, 2016. She began by noting that "the main issue here seems to be the identification of certain assets and the determination as to whether * * * they are marital or nonmarital." To that end, the trial justice first found that the legal marriage date was October 7, 2013. This was despite the testimony regarding the wedding ceremony and attempted marriage that had occurred in October 2012, because "both parties knew that they were not free to be married as [Thomas] was still married to his third wife at that time[,]" a marriage which did not legally end until August 2013. The trial justice then found that Simeng and Thomas separated in November 2015 due to irreconcilable differences in their lifestyles and in their goals for the marriage. With the relevant dates fixed, the trial justice proceeded to determine the marital estate.

- 5 -

When she determined the marital estate, the trial justice listed all the parties' assets that were in existence at the time of trial; she then analyzed them one by one to decide which should be characterized as marital or nonmarital.[3] In dispute was a 2008 BMW automobile that Simeng had purchased in the spring of 2013. The trial justice found that Simeng purchased the car with $16,000 that her parents had given to her as a gift prior to the marriage. The trial justice found that the car was registered in Simeng's name alone, and "[i]t was for the most part for her exclusive use." Accordingly, the trial justice concluded that the 2008 BMW was a nonmarital asset.

The "most significant" asset in dispute was the funds in the amount of $100,000 that Simeng's parents had wire-transferred into her and Thomas's joint Bank of America account during the marriage. The trial justice began her analysis of that asset by chronologically tracing the path of the money. On February 19, 2014, the money was wired to Thomas and Simeng's joint checking account. That same day, the couple transferred it into a joint savings account and finally into a joint money-market account. The money remained in the joint money-market account from February 19, 2014, until May 5, 2014, during which time the parties were working with an attorney in an effort to satisfy the immigration requirements so that Simeng could obtain her green card. On May 5, Simeng transferred $30,000 of that money from the joint money-market account to a new individual savings account standing in her name, then transferred $8,000 of it to a checking account that she had opened individually. Two days later, Simeng wired the remaining $62,000 back to her parents' bank account in China.

The trial justice noted that the money arrived from Simeng's parents within days of Thomas and Simeng learning from their immigration attorney that their last option to fulfill the

---

[3] We will discuss only those assets that are at issue on appeal.

green card application was to demonstrate that Thomas, as Simeng's sponsor, had approximately $100,000 in assets. The trial justice accepted Simeng's testimony that the money was a loan or gift from her parents that was intended to satisfy that requirement. The trial justice also considered that matters had been further complicated by the fact that Simeng could not maintain her own bank account as a consequence of her immigration status at the time. Indeed, the trial justice found that that was the reason Simeng's name was added to Thomas's Bank of America account and why the money was transferred into that account. Thus, contrary to Thomas's assertion, the trial justice found that the money was not a wedding gift to the couple from Simeng's parents. After all, the trial justice emphasized, from the time the $100,000 was wired into the joint account until Simeng transferred it to her individual accounts and back to her parents, neither party ever spent a penny of it.

In sum, the trial justice concluded that "at all times the $16,000 premarital gift to [Simeng] [for the car] and the $100,000 gift to [Simeng] [for immigration purposes] during the marriage were never intended to be joint gifts, * * * nor at any point during the marriage did [Simeng] transmute these assets to become marital." As such, the trial justice awarded Simeng her individual bank accounts and Thomas the remaining joint bank accounts. The trial justice decided that the only marital assets subject to equitable distribution were two boats, which had a combined value of $3,000. And because Simeng made no claim to the boats, the trial justice awarded the boats to Thomas despite the parties' stipulation that any marital property should be divided equally.

The trial justice granted both the complaint and the counterclaim for divorce. She also denied Thomas's request for counsel fees. On November 15, 2016, the trial justice entered a

decision pending entry of final judgment, which incorporated all findings, awards, and decisions made in her bench decision. It is from that decision that Thomas appeals.[4]

## II

### Standard of Review

"When hearing an appeal from the Family Court, we have said that it is not our function to arrive at de novo findings and conclusions of fact based on the evidence presented at trial." *Curry v. Curry*, 987 A.2d 233, 237 (R.I. 2010) (quoting *Schwab v. Schwab*, 944 A.2d 156, 158 (R.I. 2008)). For that reason, our review in a divorce action is deferential. *Ruffel v. Ruffel*, 900 A.2d 1178, 1184 (R.I. 2006). "The findings of fact by a trial court will not be disturbed on review unless it overlooked or misconceived material evidence or was otherwise clearly wrong." *Hurley v. Hurley*, 610 A.2d 80, 83 (R.I. 1992). Nor will we disturb a trial court's findings "[u]nless it is shown that the trial justice either improperly exercised his or her discretion or that there was an abuse thereof * * *." *Stephenson v. Stephenson*, 811 A.2d 1138, 1141 (R.I. 2002) (quoting *Gormly v. Gormly*, 760 A.2d 1241, 1243 (R.I. 2000)). Notwithstanding such deference, "when this Court reviews questions of law in an appeal from the Family Court, 'we must apply a de novo review.'" *Curry*, 987 A.2d at 238 (quoting *Schwab*, 944 A.2d at 158).

In particular, "[w]hen parties contest the equitable distribution of marital assets, 'this [C]ourt will not disturb the trial justice's findings where he or she has scrupulously considered

---

[4] Thereafter, the trial justice entered a final judgment granting the divorce from the bonds of marriage. *See Koziol v. Koziol*, 720 A.2d 230, 232-33 (R.I. 1998) ("We * * * hold that a Family Court justice may issue a final decree of divorce while other items in the decision pending entry of final judgment remain on appeal. A final judgment of divorce must be stayed only when the divorce itself is appealed. To hold otherwise would require that a final decree of divorce be issued only upon the resolution of all appeals. If one party engaged in a flurry of appeals of issues other than the divorce itself, the divorce would be delayed, often to the detriment of one or both parties.").

all of the elements set forth in * * * [G.L. 1956] § 15-5-16.1.'"[5]  *Ruffel*, 900 A.2d at 1184

(quoting *Tarro v. Tarro*, 485 A.2d 558, 560 (R.I. 1984)).  It is well established that "[e]quitable

distribution is a three-step process.  First, the trial justice must determine which of the parties'

assets are marital property and which are nonmarital property.  Second, the trial justice must

consider the factors enumerated in § 15-5-16.1.  Third, he or she must distribute the marital

property."  *Quinn v. Quinn*, 512 A.2d 848, 852 (R.I. 1986).  This Court has recognized that

"[t]he trial justice is vested with wide discretion to divide the marital property justly and fairly

between the parties."  *Stephenson*, 811 A.2d at 1141 (quoting *Gormly*, 760 A.2d at 1243).

Therefore, we will affirm an order of distribution of marital assets unless "the trial justice

---

[5] "In Rhode Island, the assignment of property upon divorce is governed by the factors listed in G.L. 1956 § 15-5-16.1(a)[.]" *Shramek v. Shramek*, 901 A.2d 593, 598 n.1 (R.I. 2006).  They are as follows:

> "(1) The length of the marriage;
> "(2) The conduct of the parties during the marriage;
> "(3) The contribution of each of the parties during the marriage in the acquisition, preservation, or appreciation in value of their respective estates;
> "(4) The contribution and services of either party as a homemaker;
> "(5) The health and age of the parties;
> "(6) The amount and sources of income of each of the parties;
> "(7) The occupation and employability of each of the parties;
> "(8) The opportunity of each party for future acquisition of capital assets and income;
> "(9) The contribution by one party to the education, training, licensure, business, or increased earning power of the other;
> "(10) The need of the custodial parent to occupy or own the marital residence and to use or own its household effects taking into account the best interests of the children of the marriage;
> "(11) Either party's wasteful dissipation of assets or any transfer or encumbrance of assets made in contemplation of divorce without fair consideration; and
> "(12) Any factor which the court shall expressly find to be just and proper." Section 15-5-16.1(a).

overlooks salient uncontradicted evidence in determining the amount of assets to be distributed." *Id.* at 1142.

## III

## Discussion

Thomas's appeal is threefold. He argues that the trial justice erred when she (1) overlooked or misconstrued marital assets; (2) did not apply all the requisite factors in making an equitable distribution of marital property under § 15-5-16.1; and (3) did not address the factors to be considered in deciding whether an award of counsel fees is appropriate under § 15-5-16.

## A

### Equitable Distribution

"In dividing property, a trial justice must decide which assets are marital property, consider the contribution of each party, and then distribute the property." *Stephenson*, 811 A.2d at 1143 (quoting *Stanzler v. Stanzler*, 560 A.2d 342, 345 (R.I. 1989)). "Such determination of the parties' marital property and its equitable distribution is within the 'sound discretion of the trial court.'" *Curry*, 987 A.2d at 238 (quoting *DiOrio v. DiOrio*, 751 A.2d 747, 750 (R.I. 2000)). Marital "[a]ssets are to be divided equitably, though not necessarily equally[.]" *Stephenson*, 811 A.2d at 1143 (quoting *Perreault v. Perreault*, 540 A.2d 27, 30 (R.I. 1988)). To achieve that equitable division, "the trial justice 'is obligated to consider the factors * * * in * * * § 15-5-16.1.'" *Curry*, 987 A.2d at 238 (quoting *DiOrio*, 751 A.2d at 750).

Thomas argues that the trial justice erred by not applying all the equitable-distribution factors enumerated in § 15-5-16.1. We disagree. The facts here are straightforward. The parties stipulated to an *equal split* of any marital property. The trial justice found that the two boats were the only marital assets; everything else was nonmarital property belonging individually to

one party or the other. And because Simeng had no interest in receiving the boats or any money possibly derived therefrom, the trial justice awarded them to Thomas. This award was notwithstanding the stipulated-to equal division of marital assets. As such, Thomas cannot claim to be aggrieved by receiving 100 percent of what the trial justice determined to be the marital estate. Moreover, given the parties' stipulation, there was no need for the trial justice to engage in an analysis of each and every statutory factor to arrive at percentages for purposes of equitable distribution; the parties provided the 50 percent apportionment figure for her.

Thus, it is apparent that Thomas's real quarrel lies with the trial justice's determination as to whether certain assets constituted marital or nonmarital property. We will now proceed to analyze those claimed errors.

**B**

**The Marital Estate**

Thomas maintains that the trial justice erred in determining the marital estate. He asserts that the trial justice incorrectly identified two assets as nonmarital property: (1) Simeng's bank accounts containing $57,500—$38,000 of which had been transferred from the parties' joint money-market account; and (2) the value of Simeng's 2008 BMW, which she had traded in to lease a new car. According to Thomas, the marital property was as follows: Simeng's bank accounts ($57,500), Thomas's bank accounts ($720), the Kelley Blue Book[6] value of the BMW ($10,000), and the boats (which he contended had no value). Therefore, Thomas claims, the total value of the marital estate was $68,220, of which he should have received $34,110 pursuant to the parties' stipulation.

---

[6] Kelley Blue Book is a reference book listing the prices of used cars. Consumers and retailers alike commonly refer to a car's listed price as its "blue book" value.

**1**

**The Car**

During the pendency of the divorce proceedings, Simeng traded in her BMW as a down payment on the lease of a new car.[7] She received $6,000 for the trade. According to Thomas, however, the blue book value of the BMW was $10,000. He argues that the BMW was marital property, subject to equitable distribution, and that, because Simeng traded in the car for less than full value, he is entitled to half its value when she traded it in as part of the transaction for the leased vehicle.

The trial justice found that the car was purchased by Simeng with money that her parents had gifted to her alone in the spring of 2013—before the marriage. Despite Thomas's assertion to the contrary, the $16,000 from Simeng's parents that she put toward the purchase price of the car was not a wedding gift, the trial justice declared. Simeng testified that the vehicle cost $19,788.48 and that she paid the difference between that price and the amount her parents had given her. She also conceded that Thomas paid a $300 deposit for the car, as well as the sales tax and registration fee totaling $1,414.48. Nevertheless, Simeng maintained that the car was registered in her name only and that Thomas had his own vehicle, exclusive to him. Thomas, meanwhile, testified that he paid for the insurance on the car and that he had cashed out an annuity to do so. For those reasons, Thomas argues that the 2008 BMW was marital property that was subject to equitable distribution. And, because the car was supposedly worth $10,000 when Simeng traded it in for $6,000, he believes he is entitled to half its actual value.

---

[7] The trial justice noted that, technically, Simeng had violated an automatic court order when she sold the BMW after the divorce proceedings had been initiated. Nevertheless, because the trial justice found the car to be a nonmarital asset, she characterized Simeng's violation as harmless.

Yet, quibbling over the value of the vehicle is putting the cart before the horse. Thomas would first have us find that the trial justice erred in determining that the car was a nonmarital asset. Deferring, as we must, to the trial justice's findings of fact, we simply cannot do as Thomas asks. The trial justice found that the money used to purchase the car was not a wedding gift to both parties, but rather a gift to Simeng for the purpose of buying the car; that the car was purchased and registered to Simeng before the parties were married; and that the car was used almost exclusively by Simeng. We perceive no error in the determination by the trial justice that the 2008 BMW was not marital property subject to equitable distribution upon divorce. We have explained that

> "§ 15-5-16.1(b) prohibits the trial justice 'from assigning three categories of property': (1) 'property * * * held by the party prior to the marriage'; (2) 'property or an interest in property which has been transferred to one of the parties by inheritance before, during, or after the term of the marriage'; and (3) 'property or an interest in property which has been transferred to one of the parties by gift from a third party before, during, or after the term of the marriage.'" *Curry*, 987 A.2d at 238 (quoting *Ruffel*, 900 A.2d at 1187); *see* § 15-5-16.1(b).

The car falls squarely within the first category because, based on the trial justice's findings, it was property held by Simeng prior to the marriage. Thus it was nonmarital property, and the trial justice was prohibited from assigning any interest therein to Thomas.

**2**

**The Bank Accounts**

As soon as Simeng obtained her green card, she opened bank accounts of her own. Into those accounts she began depositing her paychecks. She also transferred to her own accounts $38,000 of the $100,000 that her parents had wired to the joint Bank of America account. Thomas asserts that the $100,000 was a wedding gift, as evidenced by its initial presence in the

joint account. Therefore, he claims entitlement to half of the $57,500 contained in Simeng's individual bank accounts, which includes funds derived from her income earned during the marriage and the $38,000 from that purported wedding gift.[8] Thomas argues that the trial justice erred by not including the money in those accounts in the marital estate.

At issue, then, is whether the trial justice erroneously identified the $100,000 transferred to the joint account by Simeng's parents as nonmarital property. The trial justice found that Simeng's parents transferred the money to the joint account for the sole purpose of assisting Simeng to satisfy the pertinent immigration requirements. Indeed, as the trial justice detailed, the timing of the wire transfer was perfectly in sync with Simeng and Thomas's receipt of correspondence from their immigration attorney advising them that they needed to show possession of assets worth precisely that amount. The trial justice further found that none of the $100,000 was alienated by either Thomas or Simeng. The first time that either of them touched the money was when Simeng moved all of it out of the joint money-market account—transfers, the trial justice found, that Thomas never questioned and to which he lodged no objection. Based on those facts, the trial justice ultimately found that, despite the placement of the $100,000 in the joint account, there was never an intent, by either Simeng's parents or Simeng herself, to make the money marital property, and there was never any transmutation of the funds into marital property. Accordingly, the trial justice determined that the $100,000 was a gift during the marriage to Simeng alone, and hence it was nonmarital property.

This Court has had occasion to discuss the effect of one spouse's intent on the classification of a piece of property as marital or nonmarital. In *Stephenson*, we examined whether a husband's adding his wife's name to his preexisting bank accounts, thereby creating

---

[8] Thomas makes no claim to the remaining $62,000, which Simeng had already wired to her parents' bank account in China.

joint accounts, automatically converted those accounts to marital property. *Stephenson*, 811 A.2d at 1141-43. The trial justice had made explicit findings that the husband was the sole source of the funding of the accounts; that the only activity on the accounts during the marriage was the addition of the wife's name and the posting of interest by the bank; that the husband credibly testified that he did not intend to give his wife any present interest in the accounts and that he merely added her name for convenience and for estate planning purposes; and that the husband did not intend to give his wife a gift or make her a co-owner of the accounts. *Id.* at 1142-43. Yet, the trial justice determined that the act of adding the wife's name to the accounts in and of itself rendered the resulting joint bank accounts part of the marital estate. *Id.* at 1142. Along those lines, we discussed the doctrine of transmutation, whereby "property can be converted from nonmarital property into marital property if changed in form and put into joint names." *Id.* (quoting *Cloutier v. Cloutier*, 567 A.2d 1131, 1132 (R.I. 1989)); *see also Quinn*, 512 A.2d at 852. Nevertheless, we cited *Mitchell v. Mitchell*, 756 A.2d 179 (R.I. 2000), for the proposition that "[w]hile both parties are still alive, * * * the existence of a joint bank account only gives rise to a *rebuttable* presumption of an intent to make a gift of a joint interest therein * * *." *Stephenson*, 811 A.2d at 1143 (quoting *Mitchell*, 756 A.2d at 182). We therefore held that "[b]ecause the trial justice specifically found that [the husband] did not have the requisite intent to create for [his wife] any present possessory interest in the joint accounts," the trial justice erred by "then find[ing] that the contested joint accounts had transmuted into marital property by operation of law." *Id.*

The trial justice in this case made near-identical factual findings. We agree with her conclusion that there was no transmutation of the monetary gift to Simeng into marital property. *See Stephenson*, 811 A.2d at 1142. Plainly, the trial justice found, the $100,000 was not a

- 15 -

wedding gift to both parties, and there was never an intent for Thomas to have any interest in or right to the money. *See Quinn*, 512 A.2d at 852 ("The doctrine [of transmutation], which represents an application of the presumption-of-gift principle * * *, refers to a change in character of property from separate to marital by an exercise of an *actual intention objectively manifested*. * * * A transfer of nonmarital assets from one spouse to both spouses jointly, *in the absence of clear and convincing evidence to the contrary*, will be understood as evincing an intention to transfer the property to the marital estate." (Emphasis added.)). Indeed, in this case the trial justice found "by clear and convincing evidence that there was no intent for [the money] to be a marital asset." Again, deferring to the trial justice's findings, we perceive no error in her determination that the $100,000 wired by Simeng's parents into the joint account was nonmarital property. It clearly was "property * * * transferred to one of the parties by gift from a third party * * * during * * * the term of the marriage." Section 15-5-16.1(b). In our opinion, the trial justice was correct in not assigning any interest in that money to Thomas upon divorce because it was nonmarital property not subject to equitable distribution. *See Curry*, 987 A.2d at 238.

Our review of the record, however, leads us to the conclusion that the same cannot be said about the remaining funds, stated to be $19,500, in Simeng's individual bank accounts. The trial justice likewise found that, "although both [Simeng] and [Thomas] had bank accounts, and any income that they had flowing into these accounts are *technically marital assets*," the money held in those accounts was meant to remain nonmarital property. (Emphasis added.) This was so because Simeng and Thomas, the trial justice found, "always kept separate accounts" and "always paid their own bills out of their own accounts[,]" thereby evincing a clear "intent to keep the accounts separate and distinguished." Accordingly, the trial justice excluded the rest of the money in Simeng's individual bank accounts from the marital estate.

But, in our opinion, that $19,500 was not just "technically" a marital asset—it was in fact a marital asset. It is true that property that one spouse alone receives from a third party via gift or inheritance during the marriage, unless somehow transmuted, is properly classified as nonmarital property under § 15-5-16.1(b). Otherwise, in accordance with the partnership theory of marriage, assets that one spouse acquires while married are subject to equitable distribution upon divorce. *D'Agostino v. D'Agostino*, 463 A.2d 200, 203 (R.I. 1983). In other words, property acquired during a marriage is part of the marital estate unless specifically excluded by § 15-5-16.1(b). *Vanni v. Vanni*, 535 A.2d 1268, 1270 (R.I. 1988).

Here, the $19,500 in Simeng's bank accounts—money that was neither gifted nor loaned to her by her parents—necessarily must have been acquired during the marriage, as she could not, and did not, open the accounts until she obtained her green card. Based on Simeng's testimony and the trial justice's findings, it is clear that Simeng's income was the source of that money. Simeng's intent to keep the income that she earned from her employment separate and apart from Thomas's finances has no bearing on its classification as marital property. Spousal intent matters only in determining whether assets have been transmuted from nonmarital to marital property, and not the opposite. *See Quinn*, 512 A.2d at 852. Because, after excluding the $38,000 from the marital estate, the $19,500 remaining in Simeng's individual bank accounts was a marital asset, it should have been distributed in accordance with the parties' stipulation. We therefore remand for the Family Court to do so.[9]

---

[9] On remand, consistent with our above holding, the trial justice shall also distribute pursuant to the parties' stipulation any money in Thomas's bank accounts that is determined to be marital property. However, because Simeng already has eschewed any interest in the two boats, they need not be revisited.

## Counsel Fees

Thomas also requested counsel fees, and the trial justice addressed that request after assigning the property. "Pursuant to § 15-5-16, the Family Court has the authority to order one spouse to pay the counsel fees of the other spouse." *Quinn*, 512 A.2d at 854; *see* § 15-5-16. Section 15-5-16(b) sets forth certain factors that a trial justice is required to consider in deciding whether, and in what amount, to order one spouse to pay counsel fees to the other. Thomas argues before this Court that the trial justice did not address those statutory factors. In developing that argument, however, he then frames the issue as simply this: the trial justice's decision misconstrued the marital estate, leaving him unable to pay his legal fees, and if this Court does not reverse what he deems to be an inequitable distribution of assets, Simeng should be required to contribute to his counsel fees.

There is no need to engage in those mental gymnastics. It is abundantly clear from the record that the trial justice did in fact consider and expressly address the factors enumerated in § 15-5-16(b). It is clear from the record that she began her discussion of Thomas's request by listing those requisite factors. She then applied them to the facts of the instant case, placing emphasis on the short duration of the marriage and the fact that no children were born of the union. Moreover, the trial justice considered that each party was admittedly self-supporting, and that they had led completely separate financial lives throughout the term of the marriage. She discussed the fact that Thomas had supported his children from previous marriages on his own both before and during his marriage to Simeng. Thomas also had a paucity of expenses because

his mother owned the house in which he and his minor children lived, rent-free.  We need delve no further; the trial justice did not err in denying Thomas's request for counsel fees.[10]

## IV

## Conclusion

For the reasons stated above, we affirm in part and vacate in part the Family Court decision pending entry of final judgment, and remand for further proceedings not inconsistent with this opinion.  The record shall be remanded to the Family Court.

---

[10] If anything, we pause only to add that the trial justice believed it was Thomas who "unnecessarily delayed" the case for nearly a year, causing not only himself to incur needless legal expenses, but Simeng as well.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Simeng Wu-Carter v. Thomas G.J. Carter. |
| **Case Number** | No. 2017-49-Appeal.<br>(K 15-592) |
| **Date Opinion Filed** | March 14, 2018 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Kent County Family Court |
| **Judicial Officer From Lower Court** | Associate Justice Karen Lynch Bernard |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>Laura E. Ruzzo, Esq.<br>Deborah Miller Tate, Esq.<br><br>For Defendant:<br><br>H. Jefferson Melish, Esq. |